Ralph C. Loeb (SBN124773)
ralph@kranesmith.com
Daniel L. Reback (SBN 239884)
dreback@kranesmith.com
Jeremy Smith (SBN 242430)
jsmith@kranesmith.com
KRANE & SMITH, APC
16255 Ventura Boulevard, Suite 600
Encino, CA 91436
(818) 382-4000 Telephone
(818) 382-4001 Facsimile

Attorneys for Plaintiff/Counter-Defendant
CHRISTOPHER GORDON

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

CHRISTOPHER GORDON,

Plaintiff,

v.

DRAPE CREATIVE, INC., et al.,

Defendants.

AND RELATED COUNTERCLAIM.

Case No. CV 15-04905 JFW (PLAx)

**PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN SUPPORT OF OPPOSITION TO MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

[Fed.R.Civ.P. 56]

Hearing Date: October 17, 2016
Time: 1:30 p.m.
Crtrm: 16

L.R. 7-3 Conf. -1: August 12, 2016
Discovery Cut-Off: October 11, 2016
Pre-trial Conference: November 18, 2016
Trial: December 13, 2016

Plaintiff CHRISTOPHER GORDON submits this statement of genuine issues pursuant to Central District of California Local Rule 56-2 in opposition to the motion for summary judgment herein filed by Defendants DRAPE CREATIVE, INC. and PAPYRUS-RECYCLED GREETINGS, INC.

Facts 1 through 62 below correspond to the facts and supporting evidence presented in the Statement of Uncontroverted Facts and Conclusions of Law filed by the moving party. These facts are followed by additional material facts and supporting evidence showing a genuine issue.

## UNCONTROVERTED FACTS

| UNDISPUTED MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| 1. To date, Plaintiff has served seven sets of Rule 26 Initial Disclosures; the last five of which came within two months of the Discovery Cut-Off. . | 1. Declaration of Kanika D. Corley ("Corley Decl. ") ¶¶ 2-3 and 6-10, Exhs. 1-7.<br><br>Undisputed for purposes of Defendants' Motion for Summary Judgment only. |
| 2. On March 30, 2016, Defendants served Interrogatories and Requests for Production of Documents, each of which specifically requested identification of evidence Plaintiff contends establishes liability. | 2. Corley Decl. ¶ 4, Exhs. 19-20; *See*, Exh. 18 at Nos. 4, 9, 10, 11, 22, 23, 24, and Exh. 19 at Nos. 2-3, 7-11.<br><br>Undisputed for purposes of Defendants' Motion for Summary Judgment only. |
| 3. On May 25, 2016, Plaintiff served responses to Defendants' written discovery none of which specifically identified evidence sufficient to establish liability; and, Plaintiff failed to respond to Special Interrogatory Numbers 24 and 25. | 3. Corley Decl. ¶ 5, Exhs. 21-22.<br><br>Disputed. See Exhs. 21-22 to Corley Decl.<br>Objection: Argumentative |

| UNDISPUTED MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| 4. In Plaintiff's response to discovery, Plaintiff failed to identify: how he used either phrase (HBDC and HBDGAS) as a source identifier for greeting cards; how he advertised greeting cards using either phrase; any attempts to expand his business to compete with Defendants; exclusive use of either phrase in greeting cards; any goods sold by Defendants bearing the HBDC mark; and any fact showing consumer association between the phrases with Plaintiff's greeting cards. | 4. Corley Decl. ¶ 27, Exh. 21, pgs. 10-12.<br><br>Disputed. See Exh. 21 to Corley Decl.<br>Objection: Argumentative |
| 5. On July 13 and 14, 2016, Defendants presented detailed letters demanding, among others, executed verifications for the discovery responses Plaintiff served and supplementation of the evidence Plaintiff contends is sufficient to establish liability. | 5. Declaration of Jason N. Argos ("Argos Decl.") ¶ 2.<br><br>Undisputed insofar as Defendants sent the letters.<br>Disputed insofar as Plaintiff timely provided verifications for the discovery responses, which were sufficient. Reback Decl., ¶73. |
| 6. During the three months before Discovery Cut-Off, Plaintiff served 18 sets of supplemented document productions; but did not supplement his interrogatory responses. | 6. Corley Decl. ¶ 11.<br><br>Objection: Irrelevant. Lacks foundation. |
| 7. In January 2011, Plaintiff uploaded a YouTube video entitled, "The Crazy Nastyass Honey Badger (original narration by Randall)" using National Geographic content ("YouTube video"). | 7. *See* Request for Judicial Notice ("RJN") ¶ 2, Court Dkt. No. 32, ¶ 10; Corley Decl. ¶13, Exh. 9 (Deposition of Christopher Gordon) 38:2-15, 92:14-22); Corley Decl. ¶ 12, Exh. 8 (National Geographic Declaration) at ¶ 4.<br><br>Disputed insofar as the YouTube video included Plaintiff's copyrighted |

| UNDISPUTED MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| | narration. Gordon Decl., ¶5., Ex. 42. |
| 8. After publishing his YouTube video, Plaintiff registered trademarks for the phrase, "Honey Badger Don't Care," ("HBDC phrase"), for the Classes of goods containing clothing, Christmas decorations, audio books and mugs; he did not register HBDGAS for any class of goods. | 8. RJN ¶¶ 3-4; Corley Decl. ¶ 13, Exh. 9, 49-50:5-16, 140:1-3.<br><br>Undisputed. |
| 9. Plaintiff has filed 20 lawsuits against those who sell goods bearing reference to honey badgers. | 9. RJN ¶ 1; Corley Decl. ¶ 13, Exh. 9, 17-27:2-20.<br><br>Disputed: Gordon Decl., ¶41. |
| 10. Drape Creative, Inc. ("DCI") is an independent greeting card design studio, working exclusively with American Greetings and some of its subsidiaries including Papyrus-Recycled Greetings. | 10. Declaration of Tom Drape ("Drape Decl. ") ¶ 3.<br><br>Objection as to the meaning of the term "independent": lack foundation. Otherwise undisputed for the purposes of Defendants' Motion for Summary Judgment only. |
| 11. DCI creates thousands of cards annually, which regularly use animals of all variety, including badgers. | 11. Drape Decl. ¶ 5.<br><br>Objection. Irrelevant; lacks foundation, Defendants have taken the position in this action that the only greeting cards relevant are DCI<br><br>Oppenheimer Confidential Depo. 7:14-11:16; Reback Decl., Ex. 149. Drape Depo. 127:2-130:10. Reback Decl., Ex. 143. |

| UNDISPUTED MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| 12. Papyrus-Recycled Greetings ("PRG") is a greeting card manufacturer and distributor. | 12. Declaration of Aaron Siegel ("Siegel Decl.") ¶ 3.<br><br>Disputed insofar as American Greetings Corporation manufactures PRG's greeting cards. Siegel Depo. 46:3-7. Reback Decl., Ex. 144. |
| 13. Pursuant to contract, third-party retailers sell the greeting cards PRG manufactures and distributes. | 13. Siegel Decl. ¶ 3.<br><br>Undisputed for purposes of Defendants' Motion for Summary Judgment only. |
| 14. Consistent with their custom and practice, in response to correspondence from PRG referred to as "art targets," DCI designs greeting cards. | 14. Drape Decl. ¶¶ 4, 6; Siegel Decl. ¶ 4.<br><br>Disputed. Drape Depo. 76:18-77:3, 77:21-78:8. Reback Decl., Ex. 143; Siegel Depo., 12:16-15:6, 21:20-25, 24:7-1073:4-12; 78:24-79:24; Reback Decl., Ex. 144.<br><br>Objection as to Drape Decl.: irrelevant, lacks foundation.<br><br>Objection as to Siegel Decl.: lacks personal knowledge, lacks foundation. |
| 15. In response to an art target, DCI designed a birthday-themed card, which incorporates a hand-drawn image of a honey badger on the face of the card ("the first birthday-themed card"), and then submitted that card's design to PRG. | 15. Drape Decl. ¶ 6; Siegel Decl. ¶ 6, Exh. 26.<br><br>Disputed: Drape Depo. 51:19-25; 52:6, Exh. 12; 52:7-9; 76:18-77:3, 77:21-78:8; Reback |

| UNDISPUTED MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| | Decl., Ex. 143; Siegel Depo. 12:16-15:621:20-25. . 24:7-1073:4-12; 78:24-79:24; Reback Decl., Ex. 144.<br><br>Objection as to Drape Decl.: lacks foundation. Original document rule, FRE 1002<br><br>Objection as to Siegel Decl.: lacks personal knowledge, lacks foundation. Original document rule, FRE 1002 |
| 16. The first birthday-themed card was introduced to retail in June 2012. | 16. Siegel Decl. ¶ 6, Exh. 26. Siegel Depo. 12:16-15:6. Reback Decl., Ex. 144.<br><br>Disputed: Siegel Depo. 12:16-15:6,21:20-25. 24:7-10. Reback Decl., Ex. 144.<br><br>Objection. Lacks foundation and personal knowledge. |
| 17. After creating the first birthday-themed card, DCI designed the Halloween-themed greeting card, additional birthday-themed cards and an election-themed greeting card, all of which have a different style or typeface and express a sarcastic, apathetic tone about the card recipients' occasion, alongside an image of an animal delivering the message. | 17. Drape Decl. ¶¶ 5, 7-8, 10; Siegel Decl. ¶¶ 7, 8, Exhs. 27-31.<br><br>Disputed: Drape Depo. 27:1-4, 45:2-10; 45:11-18; 45:19-22, 52: 7-9,76:18-77:3, 77:21-78:8;; Exhs. 6 , 7, 8, 9, 10, 11, 12; Reback Decl., Ex. 143. . Siegel Depo. 12:16-15:6, 21:20-25, 24:7-10. Reback Decl., Ex. 144; Campana Depo. 20:11-21, 23:8-24:7.Exh. 17. Reback Decl. Ex. 146.<br><br>General objection: Misstates the cited evidence as to "express a sarcastic, apathetic tone about the card recipients' occasion", lacks foundation. Objection: lacks foundation and compound. Original document rule, FRE 1002 |

| UNDISPUTED MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| | Objection as to Drape Decl.: lacks foundation. Original document rule, FRE 1002<br><br>Objection as to Siegel Decl.: lacks personal knowledge, lacks foundation. Original document rule, FRE 1002 |
| 18. Upon receipt of DCI's designs, PRG determines whether the design fits the line and PRG then conducts a legal assessment; those designs that qualify are either sent to test or out for production. | 18. Siegel Decl. ¶ 5.<br><br>Objection as to Siegel Decl.: Irrelevant, lacks personal knowledge, lacks foundation. Siegel Depo. 12:16-15:6, 21:20-25, 24:7-10. Reback Decl., Ex. 144. |
| 19. The greeting cards PRG distributed to retail were available to the public between June 2012 and March 2016. | 19. Siegel Decl. ¶ 13.<br><br>Undisputed for purposes of Defendants' Motion for Summary Judgment only. |
| 20. None of Defendants' greeting cards that sold at retail contain the "Honey Badger Don't Care" phrase ("HBDC phrase"); the greeting cards do contain the "Honey Badger Don't Give a Shit" phrase ("HBDGAS phrase"), but not on the cover of any of the greeting cards. | 20. Siegel Decl. ¶ 9, Exhs. 26-31; Drape Decl. ¶ 9; Corley Decl. ¶ 13, Exh. 9, 130-133:10-24, 140:12-14; Corley Decl. ¶ 33, Exh. 25, ¶¶ 21, 24.<br><br>Disputed, in that Defendants have not explained what designs constitute the 21 cards constituting the AGIN numbers. Reback Decl. ¶70; Ex. 169 to Reback Decl.<br><br>Reback Decl. , ¶70, Exhs. 6,7, 8, 9. 10, 11 and 12.<br>Campana Depo. 20:11-21, 23:2-4, 23:8-24:7, 52:19-53:15, Exh, 17 and 18. Reback Decl., Ex. 146. |

| UNDISPUTED MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| | Objection: Lacks personal knowledge, lacks foundation, Original document rule. FRE 1002. Siegel Depo. 12:16-15:6, 21:20-25, 24:7-10. Reback Decl., Ex. 144. |
| 21. As is standard for Defendants' greeting cards, prominently featured on the back cover of every card, above the price appear the names, "Recycled Paper Greetings," www.prgreetings.com, and "DCIStudios.com;" Plaintiff's name does not appear. | 21. Siegel Decl. ¶ 12, Exhs. 26-31; Corley Decl. ¶ 13, Exh. 9, 135-136:5-2.<br><br>Disputed insofar as the meaning of the term "prominently".<br><br>Objection: vague and ambiguous and lacks foundation. Mischaracterizes evidence |
| 22. Defendants' greeting cards are only available for sale through brick-and-mortar retailer locations, including but not limited to Target, Wal-Mart, Rite Aid and similar stores. | 22. Siegel Decl. ¶ 3; Corley Decl. ¶ 33, Exh. 25, ¶ 20.<br><br>Disputed. Reback Decl., ¶¶46-47, Exhs.152-153 thereto. |
| 23. Two years after DCI designed the greeting cards and PRG distributed them to retailers, Plaintiff threatened DCI with legal action; DCI responded by denying any unlawful conduct, identifying applicable law and eventually began negotiating resolution. | 23. Drape Decl. ¶ 12.<br><br>Disputed. Smith Decl., ¶¶2-3. |
| 24. In lieu of appearing for deposition, on July 14, 2016, Jeanne Kim, Licensing Account Manager, Business Development at Zazzle executed a declaration that specifically identifies the greeting cards sold bearing Honey Badger related phrases, during the pendency of the 2012-2015 license agreement. | 24. Corley Decl. ¶¶ 14-15, Exh. 10 (Declaration of Zazzle, Inc., ¶¶ 1-8); *see also* Exh. 1; Corley Decl. ¶ 13, Exh. 9, 40-41:18-4.<br><br>Disputed. Ms. Kim's first declaration dated July 14, 2016 erroneously did not account for all licensed products sold. Reback Decl. ¶¶16- 18; Ex. 123 thereto |
| 25. In her July 14, 2016 declaration, Ms. | 25. Corley Decl. ¶ 15, Exh. 10, ¶3 |

| UNDISPUTED MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| Kim identifies the only Honey Badger-related greeting card sales as those where the phrases "Honey Badger Don't Care," "Honey Badger Just Takes What She Wants," and "Honey Badger Wins" appear. | and its internal Exh. 2.<br><br>Disputed. Ms. Kim's first declaration dated July 14, 2016 erroneously did not account for all licensed products sold. Reback Decl. ¶¶16- 18; Ex. 123 thereto |
| 26. According to Ms. Kim, Plaintiff sold 4 greeting cards; the first sale was December 7, 2012. | 26. Corley Decl. ¶ 15, Exh. 10, ¶ 4 and its internal Exh. 2.<br><br>Disputed. Ms. Kim's first declaration dated July 14, 2016 erroneously did not account for all licensed products sold. Reback Decl. ¶¶16- 18; Ex. 123 thereto |
| 27. Zazzle's records establish that it only sold 4 greeting cards bearing the phrases at issue in this action, and that Zazzle's sales generated approximately $12.60 in revenue, with a royalty due to Plaintiff of approximately $2.13. | 27. Corley Decl. ¶ 15, Exh. 10, ¶ 4 and its internal Exh. 2.<br><br>Disputed. Ms. Kim's first declaration dated July 14, 2016 erroneously did not account for all licensed products sold. Reback Decl. ¶¶16- 18; Ex. 123 thereto |
| 28. Plaintiff confirmed that he has no information to contradict Ms. Kim's July 14, 2016 testimony. | 28. Corley Decl. ¶ 13, Exh. 9, 44:11-13.<br><br>Objection: Misleading and argumentative.<br>Disputed: Ms. Kim's first declaration dated July 14, 2016 erroneously did not account for all licensed products sold. Reback Decl. ¶¶16- 18; Ex. 123 thereto |
| 29. On June 17, 2016, Defendants deposed TISELLE letterpress + design, which is an entity that sold greeting cards also bearing the HBDGAS phrase. | 29. Corley Decl. ¶ 21, Exh. 15 (Deposition of Tianyi Goudey: 15-17:6-23); *See also* Corley Decl. ¶ 20, Exh. 14. |

| UNDISPUTED MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| | Undisputed for purposes of Defendants' Motion for Summary Judgment only. |
| 30. Since June 2012, TISELLE has sold more than 22,000 greeting cards bearing the HBDGAS phrase, with estimated gross revenue of more than $52,000.00; the HBDGAS cards are still offered at retail. | 30. Corley Decl. ¶ 21, Exh. 15, 19-22:25-23.<br><br>Disputed insofar as Tiselle only still offers HBDGAS cards pursuant to a settlement agreement wherein Plaintiff allowed Tiselle to continue selling in exchange for 33% of gross sales, only because Tiselle lacked sufficient funds to pay a settlement. Gordon Decl. ¶143; Ex. 90 thereto |
| 31. According to TISELLE, the company began selling the HBDGAS greeting cards following a trademark search revealing no registered mark. | 31. Corley Decl. ¶ 21, Exh. 15, 34:10-24.<br><br>Disputed. Cited material does not support the alleged fact. |
| 32. As of the June 17, 2016 deposition, TISELLE had received no contact from Plaintiff or his counsel demanding that sales stop. | 32. Corley Decl. ¶ 21, Exh. 15, 26:4-10, 35:2-8, 37:5-15; Corley Decl. ¶ 13, Exh. 9, 60-61:5-7, 66-70:16-14.<br><br>Undisputed for purposes of Defendants' Motion for Summary Judgment only. |
| 33. Three days later, Plaintiff sent TISELLE a "cease and desist" letter, then attempted to obtain an agreement that she contradict her sworn deposition testimony. | 33. Corley Decl. ¶ 22, Exh. 16 (Plaintiff's Cease & Desist Letter to TISELLE letterpress + design); Corley Decl. ¶ 23, Exh. 17; Corley Decl. ¶ 13, Exh. 9, 69:2-14.<br><br>Disputed. Gordon Decl. ¶143; Ex. 90 thereto |
| 34. Based on Plaintiff's Rule 26 Disclosures, on July 29, 2016, Defendants deposed, | 34. Corley Decl. ¶ 18, Exh. 12 (Deposition of Janna Levitina: |

| UNDISPUTED MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| Janna Levitina, of The Duck Company, Inc. ("Duck Co.") -- a person Plaintiff identified as having knowledge of Plaintiff's greeting card sales. | 20:9-22); *see also* Corley Decl. ¶ 2, Exh. 1, pg. 4.<br><br>Disputed. Reback Decl. ¶19 |
| 35. Ms. Levitina affirmed that the only greeting card offered is a Christmas card that uses the HBDC phrase, Duck Co. (not Christopher Gordon) designed this card and there are no plans to create additional cards. | 35. Corley Decl. ¶ 18, Exh. 12, 58:12-16, 59: 2-5, 99-100:9-9,109:18-22; *See also* Exh. Corley Decl. ¶ 19, Exh. 13.<br><br>Undisputed for purposes of Defendants' Motion for Summary Judgment only. |
| 36. Ms. Levitina testified that Plaintiff's sales of greeting cards occurred primarily on the internet and at resort gift shops, and that the Honey Badger Christmas card is only available to its consumers between October and December of each year. | 36. Corley Decl. ¶ 18, Exh. 12, 32:3-16, 36:8-14, 109:18-22.<br><br>Undisputed. |
| 37. Ms. Levitina affirmed that the greeting card did not sell for the first time any earlier than October 2012. | 37. Corley Decl. ¶ 18, Exh. 12, 53-54:23-6.<br><br>Undisputed for purposes of Defendants' Motion for Summary Judgment only. |
| 38. Contrary to his Rule 26 description, Ms. Levitina could not identify the number of greeting cards sold, nor could the witness identify whether the greeting cards had actually sold throughout the entire United States; Plaintiff was also unable to provide this information. | 38. Corley Decl. ¶ 2, Exh. 1, pg. 4; Corley Decl. ¶ 18, Exh. 12, 56:17-22; Corley Decl. ¶ 13, Exh. 9, 44:8-10, 47:12-14, 47:18-20, 48:2-10 .<br><br>Disputed. Reback Decl. ¶19 |
| 39. In lieu of appearing for deposition, on August 4, 2016, Associate Director, Business & Legal Affairs for National Geographic Partners, LLC, Laura Layton, executed a substantive declaration | 39. Corley Decl. ¶ 12, Exh. 8 at ¶¶ 1-7.<br><br>Undisputed for purposes of Defendants' Motion for Summary Judgment only. |

| UNDISPUTED MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| responsive to the subpoena. | |
| 40. In her August 4, 2016 declaration, Ms. Layton attests that there are no documents reflecting any agreements or communications with Plaintiff with respect to the video entitled "The Crazy Nastyass Honey Badger (original narration by Randall)." | 40. Corley Decl. ¶ 12, Exh. 8, at ¶ 5-6 .<br><br>Disputed. Gordon Decl., ¶¶145-150; Exs. 91-93 thereto. |
| 41. Ms. Layton affirmed that there have been no communications between National Geographic and Christopher Gordon relating to his YouTube video or this lawsuit. | 41. Corley Decl. ¶ 12, Exh. 8 at ¶6.<br><br>Disputed. Gordon Decl., ¶¶145-150; Exs. 91-93 thereto. |
| 42. On August 15, 2016, Plaintiff admitted National Geographic never gave him permission to use their video content within the YouTube video. | 42. Corley Decl. ¶ 13, Exh. 9, 38-39:2-9, 92:5-22.<br><br>Undisputed for purposes of Defendants' Motion for Summary Judgment only. |
| 43. Plaintiff confirmed that he does not own the honey badger and that he understands the use of the HBDC and HBDGAS phrases as identifying the YouTube video, not greeting cards. | 43. Corley Decl. ¶ 13, Exh. 9, 39:7-9, 124:14-20.<br><br>Objection. Argumentative. Misstates testimony. |
| 44. Plaintiff confirmed that he does not know how many greeting cards Duck Co. sold and does not know when the company first sold greeting cards. | 44. Corley Decl. ¶ 13, Exh. 9, 44:8-10, 47:12-14, 48:2-10.<br><br>Undisputed for purposes of Defendants' Motion for Summary Judgment only. |
| 45. Plaintiff confirmed that he has been aware of others who sell greeting cards bearing the HBDGAS phrase, including TISELLE, but that before this lawsuit, no efforts were made to stop those sales. | 45. Corley Decl. ¶ 13, Exh. 9, 60:5-20, 66-70:16-14, 62-63:8-12.<br><br>Disputed. Gordon Decl., ¶¶141-144 |

| UNDISPUTED MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| | |
| 46. As of September 2016, internet based company someecards.com was still offering greeting cards using the HBDGAS phrase without Plaintiff's authorization. | 46. Corley Decl. ¶ 13, Exh. 9, 62-63:8-12; Corley Decl. ¶ 23, Exh. 17. <br><br> Objection. Irrelevant. Lacks foundation. |
| 47. Plaintiff confirmed that Defendants do not use the HBDC phrase on their greeting cards and that Defendants do not use Plaintiff's name on their greeting cards. | 47. Corley Decl. ¶ 13, Exh. 9, 130-133:10-24, 140:12-14, 135-136:5-2. <br><br> Undisputed for purposes of Defendants' Motion for Summary Judgment insofar as it is based on Plaintiff's personal knowledge. |
| 48. Prior to deposition, Plaintiff inquired of his social media followers about confusion they experienced while shopping for greeting cards and thereafter supplemented his Rule 26 Disclosures 5 times, each time identifying a new "confused" potential greeting card consumer. | 48. Corley Decl. ¶ 13, Exh. 9,127-130:25-4; Corley Decl. ¶¶ 6-10, Exhs. 3-7. <br><br> Undisputed for purposes of Defendants' Motion for Summary Judgment only. |
| 49. During July 2016, Defendants' expert, Hal Poret, completed a consumer confusion survey, the results of which yielded a net 0.7% confusion rate that led to his conclusion that the "HONEY BADGER DON'T GIVE A SH*T" phrase used within Defendants' greeting cards does not cause a likelihood of confusion with respect to Plaintiff. | 49. Corley Decl. ¶ 30, Exh. 23 (Expert, Hal Poret's Consumer Confusion Survey), pgs. 24, 40. <br><br> Disputed: Stewart Expert Report. Reback Decl., Ex, 125. Objection: improper expert opinion, improper legal conclusion, lacks foundation. |
| 50. In August 2016, Defendants' expert, Doug Bania, completed a valuation of Plaintiff's purported HBDGAS trademark, and found that Plaintiff has no such ownership rights. | 50. Corley Decl. ¶ 31, Exh. 24 (Expert Report of Doug Bania, p. 6). <br><br> Disputed: Leonhardt Decl., ¶¶6-7; 25-26; Second Zazzle Decl., Ex. 123 to Reback Decl.; Reback |

| UNDISPUTED MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| | Decl., ¶¶16-18;<br><br>Objection: improper expert opinion, improper legal conclusion and lacks foundation. |
| 51. Plaintiff did not design the greeting cards that Duck Co. and Zazzle sold. | 51. Corley Decl. ¶ 13, Exh. 9, 39:18-19, 58:12-16.<br><br>Undisputed for purposes of Defendants' Motion for Summary Judgment only. |
| 52. On August 26, 2016, Ms. Kim executed another declaration, which explained that Zazzle offers options to its consumers permitting consumers to create their own products on which they could affix any phrase Plaintiff purportedly owned. | 52. Corley Decl. ¶¶ 16-17, Exh. 11 (Amended Second Declaration on behalf of Non-Party Zazzle, Inc), ¶¶ 3-4.<br><br>Disputed. Misstates testimony. Gordon Decl. ¶¶49-53 |
| 53. Plaintiff did not designate a survey expert; instead, Plaintiff identified a rebuttal expert. | 53. Corley Decl. ¶¶ 29, 32-33, Exh. 25.<br><br>Disputed. Plaintiff designated a survey expert. Stewart Expert Report. Reback Decl., Ex, 125. |
| 54. Plaintiff's rebuttal expert opined that Plaintiff lacks fame; greeting card consumers do not connect the phrases used within the YouTube video to a particular good or service; Defendants and Plaintiff use different marketing channels for the sale of their greeting cards; and, among others, it is "unlikely that greeting card consumers will have been exposed to [Plaintiff's YouTube] video and products frequently enough to create a strong memory for the brand." | 54. Corley Decl. ¶¶ 28, 33, Exh. 25, ¶¶ 19, 20, 24.<br><br>Disputed. Misstates testimony. Ex. 125 to Reback Decl. |
| 55. DCI's designed of Defendants' greeting cards neither knew of Plaintiff nor had he | 55. Drape Decl. ¶ 11. |

| UNDISPUTED MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| ever seen the YouTube video at the time he designed the cards. | Disputed: Drape Depo. 35:9-25; Reback Decl., Ex. 143.<br><br>Additionally, Plaintiff submits that his additional facts set forth herein create an issue with respect to Drape's credibility, i.e., Plaintiff's Additional Facts Nos. 220 through 238. |

## CONCLUSIONS OF LAW

| LEGAL CONCLUSIONS | SUPPORTING AUTHORITY |
|---|---|
| 56. Christopher Gordon lacks standing to pursue federal and state law claims for trademark infringement because he cannot show that Defendants used his trademark within the greeting cards they sold. | 56. 15 U.S.C. §§ 1057(b), 1115(a) ; *Gaia Techs. v. Reconversion Techs.*, 93 F.3d 774, 777 (Fed. Cir. 1996).<br><br>Disputed. [UF Nos. 75-77; 109-111]; *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996). |
| 57. Since Plaintiff lacks standing, in their capacity as Counterclaimants, Drape Creative, Inc. and Papyrus-Recycled Greetings, Inc. are entitled to judgment on Count One of the Counterclaim that there has been no infringement. | 57. 15 U.S.C. §§ 1057(b), §1115(a); *Gaia Techs. v. Reconversion Techs.*, 93 F.3d 774, 777 (Fed. Cir. 1996).<br><br>Disputed. [UF Nos. 75-77; 109-111]; *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996). |
| 58. Defendants are entitled to judgment as a matter of law because the First Amendment of the Constitution precludes claims for trademark infringement and unfair competition, where, as here, there is no trademark use. | 58. *Rogers v. Grimaldi*, 875 F.2d 994 (2nd Cir. 1989); *Hilton v. Hallmark Cards*, 599 F.3d 894, 904 (2010) *See, Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 902 (9th Cir. 2002); *See also, Novalogic, Inc. v.* |

| LEGAL CONCLUSIONS | SUPPORTING AUTHORITY |
|---|---|
| | *Activision Blizzard*, 41 F. Supp. 3d 885, 898 (C.D. Cal. 2013).<br><br>Disputed. [UF Nos. 221-222, 240]; Drape Decl. ¶11; *Sarver v. Chartier*, 813 F.3d 891, 904-905 (9th Cir. 2016); *Dita, Inc. v. Mendez*, 2010 WL 5140855, at *2 (C.D. Cal. 2010); *Hilton v. Hallmark Cards*, 599 F.3d 894 (9th Cir. 2010); *Rebelution, LLC v. Perez*, 732 F.Supp.2d 883, 887 (N.D. Cal. 2010); |
| 59. Christopher Gordon has no valid claim against Defendants for trademark infringement because he holds no registered trademark for any phrase used by Defendants, because he cannot establish that he was the senior user of the HBDGAS phrase on greeting cards and cannot establish likelihood of confusion. | 59. Lanham (Trademark) Act, §§ 32, 43(a)(1)(A), 15 U.S.C.A. §§ 1114(1)(a); *See also* 15 U.S.C. §§ 1057(b), 1115(a); *Network Automation, Inc. v. Advanced Sys. Concepts*, 638 F.3d 1137,1144 (9th Cir. 2011) (*citing Dep't of Parks & Recreation v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006); *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999); *See also*, *Credit One Corp. v. Credit One Financial, Inc.*, 661 F. Supp. 2d 1134, 1138 (C.D. Cal. 2009); *See also*, *Glow Indus. Inc. v. Lopez*, 252 F. Supp. 2d 962, 983 (C.D. Cal. 2002)); *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir.1979).<br><br>Disputed. [UF Nos. 69, 72-74, |

| LEGAL CONCLUSIONS | SUPPORTING AUTHORITY |
|---|---|
| | 221-222, 240]; *Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113-14 (9th Cir. 2010). *Applied Info. Scis. Corp.*, 511 F.3d at 971 |
| 60. Christopher Gordon has no valid claim against Defendants for unfair competition under the Lanham Act because Defendants did not use his mark in the greeting cards they sold, and because Defendants did not take Plaintiff's physical goods and repackage those unaltered goods with Defendants' names. | 60. Lanham Act, §§ 43(a), 15 U.S.C. § 1125(a); *See also Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37 (2003).<br><br>Disputed. [UF Nos. 69, 72-74, 221-222, 240]; *Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113-14 (9th Cir. 2010). *Applied Info. Scis. Corp.*, 511 F.3d at 971; *Mercado Latino, Inc. v. Indio Prod., Inc.*, 2016 WL 2806889, at *1 (9th Cir. 2016) |
| 61. Plaintiff's claims fail because Plaintiff abandoned his purported trademark rights by engaging in naked licensing by permitting Tiselle, someecards.com and Zazzle's "fan merch" consumers to create and publicly offer HBDGAS greeting cards. | 61. *Barcamerica Intern. USA v. Tyfield Importers, Inc.*, 289 F.3d 589 (9th Cir. 2002); *See also, FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 515 (9th Cir. 2010).<br><br>Disputed. [UF Nos. 84, 142, 150-156, 309, 310, 319] |
| 62. Plaintiff cannot establish liability because Plaintiff cannot establish that Defendants had notice of a registered trademark before realizing profits, and, as a result Plaintiff cannot establish the essential element of damages. | 62. 15 U.S.C. § 1111; *Coach, Inc. v. Asia Pac. Trading Co.*, 676 F. Supp. 2d 914, 925 (C.D. Cal. 2009).<br><br>Disputed. [UF No. 79, 91-101, 145, 165, 166, 291-296] |

| LEGAL CONCLUSIONS | SUPPORTING AUTHORITY |
|---|---|
| | |

## ADDITIONAL MATERIAL FACTS

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| 63. Plaintiff Christopher Gordon ("Gordon") is a comedian, narrator, writer, and actor, and is commonly known by his alias, "Randall." | 63. Gordon decl., ¶ 1. |
| 64. On January 18, 2011, under the alias "Randall," Gordon published a video (the "Video") on YouTube that consisted of his original narration humorously describing the traits of a honey badger. The Video can be viewed at https://www.youtube.com/watch?v=4r7wHMg5Yjg or by searching on YouTube.com for its title, *The Crazy Nastyass Honey Badger (original narration by Randall).* | 64. Gordon decl., ¶ 2. |
| 65. Gordon's Video is immensely popular and, to date, has generated more than 79 million views on YouTube alone. The Huffington Post proclaimed the Video as "the best nature video of all time." | 65. Gordon decl., ¶ 2; Anderson depo, 38:14-19. |
| 66. In the Video, Gordon repeatedly uses the expressions and jokes that the "Honey Badger Don't Care" and the "Honey Badger Don't Give a Shit." | 66. Gordon decl., ¶ 3; transcript of narration, Ex. 41 to Gordon decl. |
| 67. In the Video, Gordon recites the phrase "Honey Badger Don't Give a Shit" verbatim or similarly four (4) different | 67. Gordon decl., ¶ 3; transcript of narration, Ex. 41 to Gordon decl. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| times. | |
| 68. Gordon copyrighted his narration in the Video; the effective date of registration is June 15, 2011; and the title is Honey Badger Don't Care. | 68. Gordon decl., ¶. 4; Copyright certificate, Ex. 42 to Gordon decl. |
| 69. Gordon trademarked the phrase "Honey Badger Don't Care" with the United States Patent and Trademark Office ("USPTO") for various classes of goods, including t-shirts, Christmas ornaments, talking dolls, mugs, audio books and video games. Gordon has four (4) separate Trademark Registrations. | 69. Gordon decl., ¶ 5; trademark Registrations, Ex. 43 to Gordon decl. |
| 70. On October 18, 2011, Gordon filed a trademark application for goods in Class 16, in which Gordon states he has been selling bumper stickers, an expressive product, bearing his mark at least as early of October 7, 2011. On September 9, 2016, the USPTO issued a Notice of Acceptance of Statement of Use, stating Gordon's mark will register and the registration certificate will issue in due course barring any extraordinary circumstances. | 70. Reback decl., para 26; trademark application for Class 16, Ex. 131 to Reback decl.; Notice of Acceptance of Statement of Use, Ex. 132 to Reback decl. |
| 71. Gordon filed his first trademark application on October 14, 2011, and received his first trademark registration on January 29, 2013. | 71. Gordon decl., ¶ 6; trademark registrations, Ex. 43 to Gordon decl. |
| 72. On February 9, 2012, the USPTO issued an Office Action, rejecting Gordon's trademark application on ornamental grounds, i.e., that his use of Honey Badger Don't Care was | 72. Gordon decl., ¶ 7; USPTO's Office Action dated February 9, 2012, Ex. 44 to Gordon decl. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| purportedly an ornamental feature of his goods and did not indicate the source of goods. | |
| 73. After the USPTO's initial rejection, on August 9, 2012, Gordon provided a detailed response to the USPTO in which he included specimens of various goods he sold bearing Honey Badger Don't Care in order to demonstrate it was indeed a source identifier. | 73. Gordon decl., ¶ 7; Response to Office Action dated August 9, 2012, Ex. 45 to Gordon decl. |
| 74. After Gordon submitted his Response to Office Action dated August 9, 2012, the USPTO approved his trademark for publication, and issued his trademark registrations. | 74. Gordon decl., ¶ 7. |
| 75. In 2011, Gordon sold honey badger goods on www.iheartthisplace.com, a website owned by Gordon's wife, Rebecca Sgan Cohen, and mother-in-law, Virginia Green ("Green"). | 75. Green depo, 21:18 - 22:2; Reback Decl. Ex. 140.Cohen depo, 40:12-25; Reback Decl. Ex. 141.Gordon decl., ¶ 8. |
| 76. In February 2011, Gordon first sold a Honey Badger Don't Care t-shirt on www.iheartthisplace.com. | 76. Green depo, 23:2-6; Reback Decl. Ex. 140.Cohen depo, 41:6-9; Reback Decl. Ex. 141. Gordon decl.. ¶ 8. |
| 77. In 2011, on www.iheartthisplace.com, Gordon sold t-shirts, tank tops, coffee mugs and bumper stickers that bore his signature phrase "Honey Badger Don't Give a Shit", and sold those same products, plus Christmas ornaments and baby clothes, that bore his | 77. Green depo, 26:12 - 28:18; 80:10 - 81:14; Reback Decl. Ex. 140.Cohen depo, 13:21 - 15:13; Reback Decl. Ex. 141. Gordon decl., ¶¶ 9-10; image of "Honey Badger Don't Give a Shit" mug, Ex. |

| ADDITIONAL MATERIAL FACTS | | SUPPORTING EVIDENCE | |
|---|---|---|---|
| | signature phrase "Honey Badger Don't Care." | | 46 to Gordon decl.; Facebook post dated May 8, 2011 depicting Gordon's fans wearing Honey Badger Don't Care and Honey Badger Don't Give a Shit t-shirts, Ex. 47 to Gordon decl.; image from www.iheartthisplace.com depicting Gordon products available for sale, Ex. 49 to Gordon decl. |
| 78. | In 2011, Gordon sold a talking honey badger stuffed animal that had eight sayings from the Video, which was also sold on www.iheartthisplace.com. The regular version said "honey badger don't care" and the r-rated version said "honey badger don't give a shit". | 78. | Green depo, 50:23 - 51:12; Reback Decl. Ex. 140. Cohen depo, 45:21 - 46:6; Reback Decl. Ex. 141. Gordon decl., ¶ 50. |
| 79. | "Honey Badger Don't Care", with a "TM" insignia next to it, was prominently displayed on the front of the box which contained the talking honey badger doll. | 79. | Gordon decl, ¶ 10; image of honey badger doll box, Ex. 48 to Gordon decl. |
| 80. | Gordon sold his honey badger products on www.iheartthisplace.com to all 50 states, and also in Canada, France, and England. | 80. | Green depo, 48:22 - 49:3; Reback Decl. Ex. 140.Cohen depo, 39:25 - 40:9. Reback Decl. Ex. 141. |
| 81. | The sales prices of Gordon's honey badger products sold on www.iheartthisplace.com were approximately: $35 for t-shirts; $25 for tank tops; $10 for cups; $15 for onesies; $10-$15 for Christmas ornaments; and $3.99 for bumper | 81. | Green depo, 28:19 - 29:2. Reback Decl. Ex. 140. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| stickers. | |
| 82. In mid-2011, a photograph of the famous actress Olivia Wilde appeared in different media outlets in which she was wearing one of Gordon's original Honey Badger Don't Care t-shirts. Numerous media outlets picked up on the story, and published articles about Ms. Wilde wearing his shirt, and also using his phrase "honey badger don't give a shit" in reference to Gordon and his Video. | 82. Gordon decl., ¶¶ 11-15. |
| 83. In 2011, Gordon sold between 12,000-15,000 units of honey badger merchandise; Green was ordering a thousand shirts per month, and running out of inventory; and the total gross sales of honey badger merchandise in 2011 on www.iheartthisplace.com was between $250,000-$300,000. This business was operated from a barn in Maine, where Green received consumers' orders and produced the goods. | 83. Green depo, 24:9 - 26:17; Reback Decl., Ex. 140. Gordon decl, ¶ 16. |
| 84. In order to monetize the profitability of his rights and grow his business, Gordon selectively licensed his intellectual property rights to third parties. In approximately late 2011, he started Randall's Honey Badger, LLC ("RHB"), as a vehicle to build his brand and products. The members of RHB were Gordon, Green, and his managers Danny Sherman and Josh Kesselman. All rights RHB possessed have reverted back to Gordon. | 84. Gordon decl., ¶ 17. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| | |
| 85. RHB created a "look book" or "brand deck" which was a promotional book that provided a synopsis of what Gordon's brand had to offer. The look book was typically sent by RHB members or its licensing agents to potential licensees in an effort to work with other companies in helping to build Gordon's brand. | 85. Gordon decl., ¶ 26; look book, Ex. 52 to Gordon decl. |
| 86. Paul Leonhardt ("Leonhardt") is a licensing agent, who has connections in the greeting card industry. In December 2011, he was introduced to Gordon. At the time, Leonhardt was aware of Gordon's Video, that Gordon's expressions in the Video, such as "Honey Badger Don't Care" and "Honey Badger Don't Give a Shit," had notoriety with the public, and thus thought Gordon would be a good client to have as Leonhardt would be able to procure licensing deals to exploit Gordon's intellectual property rights. | 86. Leonhardt decl., ¶¶ 2-8. |
| 87. In December 2011-January 2012, Gordon agreed that Leonhardt would direct a licensing program pursuant to which he would procure licensees who would develop and sell products bearing Gordon's signature phrases. | 87. Leonhardt decl., ¶ 7; Gordon decl., ¶ 18. |
| 88. Gordon and his team thought the honey badger brand should expand into greeting cards because the cards would be complimentary of the goods, including t-shirts, already being sold. | 88. Green depo, 72:10 - 73:12; Reback Decl., Ex. 140. Gordon decl., ¶¶ 19-20; emails dated December 8, 2011 with Jeff Silberman, |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| | Ex. 50 to Gordon decl. |
| 89. Leonhardt specialized in greeting cards, and was brought in by Gordon's managers as someone who had many connections with greeting card companies. Gordon and his RHB team met with Paul, and at the first meeting, he said he had connections at American Greetings. | 89. Leonhardt decl., ¶ 8; Green depo, 42:20 - 44:6; 44:18 - 45:6; 67:8 - 72:9; Gordon decl., ¶ 21. |
| 90. Leonhardt thought a greeting card company would be a natural fit to become a licensee of Gordon for many reasons including (1) Gordon had been selling authorized t-shirts, and t-shirts and greeting cards could go hand-in-hand as complimentary products, (2) Gordon could potentially enter the mass market retailer chains (e.g., Target and WalMart) with both authorized t-shirts and greeting cards, and (3) greeting cards bearing Gordon's phrases would sell well given the popularity of his Video. Accordingly, Leonhardt immediately began to contact representatives at greeting card companies, including American Greetings, to see if any greeting card companies were interested in becoming licensees. | 90. Leonhardt decl., ¶ 8. |
| 91. On January 4, 2012, Leonhardt emailed Ms. Janice Ross ("Ross"), an employee at American Greetings, whose contact information was known by Leonhardt. In Leonhardt's email dated January 4, 2012 to Ross, he provided her a direct link to Gordon's Video; advised her the Video had over 30 million views at the | 91. Leonhardt decl., ¶¶ 9-10; emails January 4, 2012 - February 23, 2012, Ex. 95 to Leonhardt decl. |

| ADDITIONAL MATERIAL FACTS | | SUPPORTING EVIDENCE | |
|---|---|---|---|
| | time; and stated he would like to talk to her about "doing a greeting card license." Leonhardt advised Ross that Randall's Animals are featured on a national pistachio television advertisement; Gordon's book is coming out from Andrews McNeel; and he had been featured as one of America's Hottest Brands by Advertising Age. Leonhardt also provided Ross with a direct link to the Advertising Age article, which is available at http://adage.com/article/special-report-americas-hottest-brands/america-s-hottest-brands-honey-badger/231200/. Leonhardt concluded his email to Ross by stating, "The Honey Badger would be [a] great line of greeting cards, talking greeting cards and e-cards. Let me know you[r] thoughts and let's schedule a call." | | |
| 92. | On January 6, 2012, after not receiving a response from Ross, Leonhardt emailed her again, asking her to confirm that she received his prior email. That day, Ross replied by email, stating, "Hi Paul - Got your email. Can you give me a few days to review and I'll connect with you later next week." | 92. | Leonhardt decl., ¶ 10; emails January 4, 2012 - February 23, 2012 , Ex. 95 to Leonhardt decl. |
| 93. | On January 13, 2012, after not receiving a reply from Ross, Leonhardt again emailed her, stating he "wanted to get [her] thoughts on moving forward with a license." | 93. | Leonhardt decl., ¶ 11; emails January 4, 2012 - February 23, 2012 , Ex. 95 to Leonhardt decl. |
| 94. | On January 19, 2012, after not | 94. | Leonhardt decl., ¶ 12; emails |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| receiving a reply from Ross, Leonhardt again emailed her, stating: "Hope you are well. Just following up, [to] see if we can[] get a deal done. I've attached the press kit for you to review." | January 4, 2012 - February 23, 2012 , Ex. 95 to Leonhardt decl; Leonhardt press kit, Ex. 96 to Leonhardt decl. |
| 95. On January 19, 2012, Ross replied by email, stating the American Greetings team was "reviewing the opportunity." Ross wrote: "I think it's a really fun and irreverent property and would love to see if there's an opportunity on one of our distribution platforms. But in order to do that, I need to get some key colleagues of mine on board the Crazy Honey Badger bandwagon. Thanks for your patience. I hope to know more in early February which is right around the corner." | 95. Leonhardt decl., ¶ 13; emails January 4, 2012 - February 23, 2012 , Ex. 95 to Leonhardt decl. |
| 96. Subsequently, Leonhardt spoke with Ross, and she mentioned one of American Greetings' distribution platforms being considered was Recycled Paper Greetings, a defendant in this action. | 96. Leonhardt decl., ¶ 13. |
| 97. Based on Leonhardt's conversation with Ross, he believed Ross did all of the licensing for all of American Greetings' distribution channels, including Recycled Paper Greetings. | 97. Leonhardt decl., ¶ 13. |
| 98. On February 2, 2012, after not hearing from Ross, Leonhardt sent her another email, advising her that Gordon (Randall) was featured on the television show Extra, and provided her a direct internet link to the article. | 98. Leonhardt decl., ¶ 14; emails January 4, 2012 - February 23, 2012 , Ex. 95 to Leonhardt decl. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| | |
| 99. On February 10, 2012, Leonhardt again spoke with Ross by telephone to get an update on American Greetings' review. Ross said that she liked the honey badger property/brand and it would translate well, she would see how it could fit in with the American Greetings family, and she would reach out to her colleagues at American Greetings' distribution platforms that did more edgy products. | 99. Leonhardt decl., ¶ 15. |
| 100. On February 10, 2012, after speaking with Ross, Leonhardt emailed her. In his email, Leonhardt again attached the "press kit" or "deck" which described Gordon's brand and provided her with more internet links that featured stories about Gordon. | 100. Leonhardt decl., ¶ 15; emails January 4, 2012 - February 23, 2012 , Ex. 95 to Leonhardt decl. |
| 101. On February 23, 2012, Leonhardt emailed Ross, stating Gordon's Video was up to 38 million views, which was "up 5 Million views since we first started talking." He wrote: "We also have new license deals with Fiesta Toys for Plush, License 2 Play for Plush, Jem Sportswear for Apparel, Bioworld for Accessories, Rasta Imposta for costumes and Bazoo for Games and Toys. We would really like to work with American Greeting[s], let me know what I can do to help you move this forward." | 101. Leonhardt decl., ¶ 16; emails January 4, 2012 - February 23, 2012 , Ex. 95 to Leonhardt decl. |
| 102. In addition to American Greetings, Leonhardt also inquired of other greeting card companies, including | 102. Leonhardt decl., ¶¶ 17-18; emails with Hallmark and Leanin' Tree, Ex. 97 to |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| Hallmark and Leanin' Tree, to see if they were interested in a license agreement with Gordon for greeting cards. | Leonhardt decl. |
| 103. On February 3, 2012, Leonhardt emailed Gordon and his team, providing an update on what Leonhardt was doing on the licensing front. He noted there was interest from American Greetings. Included in the email was a chart Leonhardt drafted, detailing various companies he had reached out to regarding a potential license deal. The companies included American Greetings, and other greeting card companies too. | 103. Leonhardt decl., ¶ 19; email February 3, 2012, Ex. 98 to Leonhardt decl; Gordon decl., ¶24. |
| 104. On February 16, 2012, Leonhardt again emailed Gordon and his team, stating he had "serious interest from American Greeting[s]." | 104. Leonhardt decl., ¶ 20; email February 16, 2012, Ex. 99 to Leonhardt decl; Gordon decl., ¶ 25. |
| 105. In response to a document subpoena issued to Albertsons, a retailer which sold Defendants' cards, Albertsons obtained responsive information and documents for the subpoena by contacting American Greetings personnel, including Patty Motta, who is identified on Defendants' Privilege Log. | 105. Albertsons Email, Ex. 128 to Reback decl.; Defendants' Privilege Log, Ex. 137 to Reback decl. |
| 106. Leonhardt ended up procuring at least six (6) licensing deals for Gordon, all of which generally allowed the various licensees to sell authorized goods bearing Gordon's signature phrases from the Video, including "Honey | 106. Leonhardt decl., ¶ 21; Gordon decl., ¶ 27. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| Badger Don't Care" and "Honey Badger Don't Give a Shit." The six companies included: Zazzle Inc.; The Duck Company; Rasta Imposta Costumes; License 2 Play, Inc.; Fiesta Toys, Inc.; and Universal Screen Arts, Inc. | |
| 107. Gordon received advances on each of the six licensing agreements procured by Leonhart, in excess of $40,000 for advances alone, and received royalty payments based on a percentage of sales revenue generated by the licensees. Gordon's six licensees procured by Leonhardt generated in excess of $1,000,000.00 in sales revenue from selling licensed products. | 107. Leonhardt decl., ¶ 22. |
| 108. Zazzle was allowed to make and sell various products, including greeting cards and t-shirts, under its license agreement with RHB. The Zazzle license agreement was entered into on about May 12, 2012. | 108. Second Zazzle Declaration, Ex. 123 to Reback Decl.; Gordon decl., 28; Zazzle license agreement, Ex. 53 to Gordon decl. |
| 109. In May 2012, Zazzle first sold a greeting card pursuant to its license agreement with Gordon. | 109. Second Zazzle Declaration, Ex. 123 to Reback Decl.; Gordon decl., ¶ 28. |
| 110. Zazzle has sold in excess of 1,600 greeting cards pursuant to its license agreement with Gordon for which he has received royalties. | 110. Second Zazzle Declaration, Ex. 123 to Reback Decl. |
| 111. Some of the Zazzle greeting cards sold under its license agreement with Gordon included the phrase "Honey Badger Don't Give a Shit." | 111. Second Zazzle Declaration, Ex. 123 to Reback Decl.; Gordon decl., 28. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
| --- | --- |
| | |
| 112. From November 14-27, 2013, Gordon exchanged emails with a Zazzle employee, Ashley Bowles, about his licensed merchandise. In her email dated November 14, 2013, she identified some of the best selling designs of licensed products, including four images of greeting cards. Two of them said, "Honey Badger Don't Care About Your Birthday". One of the popular mugs she identified had the phrases, "Honey Badger Don't Care [] Honey Badger Don't Give a Shit" on the licensed mug. | 112. Gordon decl., ¶ 29; emails November 14-27, 2013, Ex. 54 to Gordon decl. |
| 113. On November 22, 2013, Gordon received another email from Ms. Bowles, who wrote Zazzle was excited to extend a promotional code which was good for "50% off all greeting cards + 20% off everything else on Zazzle.com...." | 113. Gordon decl., ¶ 30; emails November 22-27, 2013, Ex. 55 to Gordon decl. |
| 114. From May 12, 2012 to May 12, 2015, Zazzle sold in excess of $400,000 in licensed products under its license agreement with Gordon, an amount which includes greeting card sales. | 114. Second Zazzle Declaration, Ex. 123 to Reback decl. |
| 115. While the Zazzle agreement provides a termination date of about May 2015, Zazzle has continued to sell licensed products pursuant to the agreement. For instance, on May 15, 2015, Gordon received an email from Ms. Sofya Elperin, an account manager of Zazzle, stating that a discount code for his products was "live" and also that | 115. Gordon decl., ¶ 31; emails dated December 16, 2014 to May 15, 2015, Ex. 56 to Gordon decl. |

| ADDITIONAL MATERIAL FACTS | | SUPPORTING EVIDENCE | |
|---|---|---|---|
| | Randall's Honey Badger "is a featured partner" on Zazzle's Brand Offers section on its Deals page. Ms. Elperin noted Gordon's products would be featured through June 12, 2015. | | |
| 116. | The Duck Company was allowed to sell licensed products, including t-shirts, caps and accessories, which included greeting cards, under its license agreement with RHB. The Duck Company license agreement was entered into on October 1, 2012. | 116. | Gordon decl. ¶ 32; Duck license agreement, Ex. 57 to Gordon decl. |
| 117. | The Duck Company sells goods wholesale primarily to the resort industry, and also sells retail via e-commerce to anyone over the internet. | 117. | Levitina depo, 9:23 - 10:13. Reback Decl., Ex. 139. |
| 118. | Since 2012, The Duck Company has sold t-shirts, caps and accessories per its license agreement with Gordon. The only accessory sold at retail is a "Honey Badger Don't Care" Christmas greeting card. | 118. | Levitina depo, 31:14 - 32:16; 34:21 - 35:20; 37:16-21; 57:3-24; 84:12-16; 90:21 - 91:14; Reback Decl., Ex. 139. Gordon decl., ¶ 33. |
| 119. | The "Honey Badger Don't Care" greeting card is still offered for sale. | 119. | Levitina depo, 37:22-24; 61:2-5. Reback Decl., Ex. 139. |
| 120. | The greeting card costs $3.75. | 120. | Levitina depo, 64:17-21. Reback Decl., Ex. 139. |
| 121. | An idea behind The Duck Company greeting card was "if you're going to buy the shirts as a gift, you could get some cards in the process." | 121. | Levitina depo, 61:11-18. Reback Decl., Ex. 139. |
| 122. | Usually The Duck Company does not sell the greeting card by itself, but instead "somebody will buy a couple of Honey Badger shirts and give them as a | 122. | Levitina depo, 82:18 - 83:6. Reback Decl., Ex. 139. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| gift, so they'll buy them and pick up a couple of cards to go along with it, with the shirts." | |
| 123. On May 17, 2016, Ms. Levitina emailed Gordon, providing an image of the Honey Badger Don't Care greeting card which The Duck Company sells, and she wrote, "people tend [to] buy [it] along with the Honey Badger shirts". She also wrote that Gordon's shirts are "still popular with our customers", and she thanked Gordon "for the boost" he provided by promoting the products. | 123. Gordon decl. ¶ 37; Email May 17, 2016, Ex. 61 to Gordon decl. |
| 124. The Duck Company sells authorized short-sleeved shirts, long-sleeved shirts, and hoodies bearing the phrase "Honey Badger Don't Give a Shit". | 124. Levitina depo, 38:2-15. Reback Decl., Ex. 139. |
| 125. The phrases on The Duck Company's licensed goods are usually "Honey Badger Don't Care" or "Honey Badger Don't Give a Shit". | 125. Levitina depo, 48:9 - 49:10. Reback Decl., Ex. 139. |
| 126. The phrases used by The Duck Company pursuant to its license, including "Honey Badger Don't Care" and "Honey Badger Don't Give a Shit" are "all references to the Honey Badger video." | 126. Levitina depo, 100:10-20. Reback Decl., Ex. 139. |
| 127. The demographic of The Duck Company purchasers of Gordon's goods is 18-35 year old males. | 127. Levitina depo, 101:23 - 102:7. Reback Decl., Ex. 139. |
| 128. The Duck Company has sold its licensed honey badger products to all | 128. Levitina depo, 41:7-22; Reback Decl., Ex. 139. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| 50 states, and internationally as well. | Gordon decl. ¶ 34; emails dated August 28, 2013 - September 24, 2013, Ex. 58 to Gordon decl. |
| 129. The Duck Company is still selling licensed honey badger goods. | 129. Levitina depo, 41:23 - 42:5; 43:23 - 44:18. Reback Decl., Ex. 139. |
| 130. The Duck Company, and Gordon, still advertise and promote the greeting card, and other honey badger goods, as "the Honey Badger is still popular." | 130. Levitina depo, 59:6 - 60:22; 72:23 - 73:11; 73:25 - 75:11; 86:3-8. Reback Decl., Ex. 139. |
| 131. The Duck Company customers still reference the Gordon catchphrases; the company still sells goods and has to re-order more inventory every one to two months. | 131. Levitina depo, 09:23 - 110:25; 115:19 - 116:9. Reback Decl., Ex. 139. |
| 132. The Duck Company has sold in excess of $300,000 in licensed products, which includes a Honey Badger Don't Care greeting card. | 132. Jim Bruno decl., Ex. 124 to Reback decl. |
| 133. Rasta Imposta Costumes was allowed to make and sell children and adult Halloween costumes, novelty hats and Halloween accessories, and was authorized to distribute such products to mass market retailers, under its license agreement with RHB. The Rasta Imposta license agreement was entered into on February 7, 2012. | 133. Gordon decl., ¶ 38; Rasta Imposta Costumes license agreement, Ex. 62 to Gordon decl. |
| 134. Rasta Imposta sold an officially licensed costume bearing the phrase "Honey Badger Don't Care" at mass retailers including Wal-Mart, which is still selling the costume. | 134. Gordon decl., ¶ 38; Leonhardt decl., ¶ 24. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| | |
| 135. License 2 Play, Inc. was allowed to make and sell various plush toys and novelties, including hats, mugs, drinkware, slippers, pillows, plush backpacks, lanyards and throw blankets, under its license agreement with RHB. The License 2 Play, Inc. license agreement was entered into on about January 31, 2012. Some of the products were sold at national retailer chains such as Hot Topic and Urban Outfitters. | 135. Gordon decl., ¶ 39; License 2 Play, Inc. license agreement, Ex. 53 to Gordon decl. |
| 136. Fiesta Toys, Inc. was allowed to make and sell various types of plush toys and novelties under its license agreement with RHB. The Fiesta Toys, Inc. license agreement was entered into on about February 23, 2012. | 136. Gordon decl., ¶ 40; Fiesta Toys license agreement, Ex. 64 to Gordon decl. |
| 137. Universal Screen Arts, Inc. was allowed to make and sell t-shirts and sweatshirts and in the direct marketing/telephone/mail-order field under its license agreement with RHB. The Universal Screen Arts, Inc. license agreement was entered into on about August 28, 2012. | 137. Gordon decl., ¶ 41; Universal Screen Arts license agreement, Ex. 65 to Gordon decl. |
| 138. RHB entered into a license agreement with a company called Decal Gal, which was allowed to make and sell SKINS, which are removable vinyl decals, enabling customers to customize their electronic devices. The Decal Gal license agreement was entered into on about June 1, 2012. | 138. Gordon decl., ¶ 46; Decal Gal license agreement, Ex. 71 to Gordon decl. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| 139. RHB entered into a license agreement with a company called Trends International, LLC, which was allowed to make and sell posters, stickers, decals, bookmarks and writing instruments. The Trends International, LLC license agreement was entered into on about March 1, 2012. | 139. Gordon decl., ¶ 47; Trends International, LLC license agreement, Ex. 72 to Gordon decl. |
| 140. Jeff Marine ("Marine") served as CEO of JEM Sportswear, Inc. ("JEM"), a manufacturer of apparel which distributed to many well-known chain stores, including Target, Wal-Mart, Macy's, Sears, and JC Penney. | 140. Marine decl., ¶ 3. |
| 141. In February 2012, Marine was introduced to Gordon, and was aware of Gordon's Video and that his signature expressions in the Video, such as "Honey Badger Don't Care" and "Honey Badger Don't Give a Shit," had come to identify him and his alter ego, Randall, with the public. As such, Marine thought Gordon would be a good client for JEM to have, and that JEM would be able to sell Gordon's licensed products bearing his well known phrases to retailers such as Target and Wal-Mart. | 141. Marine decl., ¶ 6. |
| 142. At the time (early February 2012), Gordon was deciding between JEM and another company, Bioworld, to serve as licensees to get his authorized t-shirts into mass retailers like Target and Wal-Mart. Both JEM and Bioworld made offers to become licensees. | 142. Gordon decl., ¶ 42; emails February 17 and 21, 2012, Ex. 66 to Gordon decl. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| | |
| 143. On February 23, 2012, JEM and Gordon entered into a license agreement pursuant to which JEM was allowed to manufacture and distribute various products bearing Gordon's phrases, including "Honey Badger Don't Care" and "Honey Badger Don't Give a Shit." Such products included women's, girl's, junior's, men's and boy's t-shirts, sweatshirts and active wear. The distribution channels included speciality stores, department stores, mid-tier stores and mass market, throughout the United States. JEM provided an advance of $25,000, and a total guarantee of $50,000, both of which were non-returnable and non-refundable, and paid royalties based on JEM's net sales. | 143. Marine decl. ¶¶ 7-8; license agreement, Ex. _ to Marine decl.; advance check, Ex. 101 to Marine decl.; Gordon decl., ¶ 43. |
| 144. Pursuant to the JEM license agreement, Gordon's authorized goods were distributed to mass market retail stores throughout the United States, such as Target and Wal-Mart. | 144. Marine decl., ¶ 9. |
| 145. JEM sold a licensed "Honey Badger Don't Give a Shit" shirt to Target, which sold it to the public. | 145. Marine decl., ¶ 9; Ex. 102 to Marine decl. [image of "Honey Badger Don't Give a Shit" shirt sold by JEM to Target]; Gordon decl., ¶ 43; email February 29, 2012 and attached neck label/tag with TM logo, Ex. 67 to Gordon decl. |
| 146. JEM sold licensed "Honey Badger Don't Care" t-shirts to Wal-Mart, | 146. Marine decl., ¶ 9; Ex. 103 to Marine decl. [image of |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
| --- | --- |
| which sold it to the public. | "Honey Badger Don't Care" shirts sold by JEM to Wal-Mart]. |
| 147. In the Second Quarter of 2012 alone, JEM's gross sales of licensed products amounted to at least $292,570.10. In the Third Quarter of 2012, JEM's gross sales of licensed products amounted to at least $23,505.40. And in the Fourth Quarter of 2012, JEM's gross sales of licensed products amounted to at least $35,139.00. Thus, in the year 2012 alone, JEM's gross sales of licensed products under the JEM license agreement exceeded $350,000. | 147. Marine decl., ¶¶ 10, 12; JEM sales and royalty reports, Ex. 104 to Marine decl. |
| 148. JEM has not been able to find all of the quarterly sales and royalty reports. JEM sold licensed goods through at least the year 2013. | 148. Marine decl., ¶ 11. |
| 149. JEM's gross sales of the licensed products were only a fraction of the retailers' total gross sales. JEM had agreements with its retailer clients such as Target and Wal-Mart, and under those agreements, the retailers would receive at least 50% of the gross sales generated at their stores, and send the remainder to JEM as a royalty. In other words, if JEM's gross sales of licensed products amounted to at least $350,000 in the year 2012, then the retailers' gross sales of those products must have necessarily amounted to at least double, $700,000, in the year 2012 alone. | 149. Marine decl., ¶ 13. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| | |
| 150. Gordon had the power to, and did, approve and reject designs submitted by JEM. | 150. Gordon decl., ¶¶ 44-45; February 16, 2012 email, Ex. 68 to Gordon decl; February 22, 2012 email and attached "approval form" for submitted designs, Ex. 69 to Gordon decl; email August 30, 2012, Ex. 70 to Gordon decl.; JEM license agreement, Ex. 100, Marine decl., ¶ 7, at Section 6 [providing in part that JEM could not sell products without RHB's approval]. |
| 151. Gordon was able to, and did, reject many designs and concepts proposed by his licensees. Additionally, many of the license agreements had similar quality control provisions that generally provided: all licensed products must be sold in accordance with a business plan that is "mutually agreed upon" between the parties prior to the launch of licensed products; that RHB would have "full right of approval over the designs for packaging, bags, labels, product inserts and other printed materials"; how licensed products shall be branded as Randall's Honey Badger or as otherwise approved by RHB; and RHB has "absolute approval" of all licensed products "at all stages" of development. | 151. Gordon decl., ¶ 48; License agreements for The Duck Company, License 2 Play, Rasta Imposta, and Fiesta Toys, at Exhs. 57, 62-64 to Gordon decl, at Sections 3D, 7H, and 8B. |
| 152. Regarding the Zazzle license | 152. Gordon decl., ¶ 49; Zazzle |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| agreement, while users could create licensed products (i.e., FanMerch products or "non-Store" products) for which Gordon would receive royalties, such products would be subject to guidelines, including: Zazzle would filter/screen the content; Gordon could reject samples of licensed products; and he could provide Zazzle with use guidelines or other restrictions regarding its right to use his trademark or licensed property, and any use should be agreed in advance by RHB. | license agreement, Ex. 53 to Gordon decl., at Sections 5.3, 8.2, and 10.2. |
| 153. There are Rules and Regulations of the Honey Badger FanMerch page by Zazzle, and the rules provide in part that: FanMerch users may "create and submit original designs inspired by Randall's Honey Badger"; the design submissions must be consistent with specified terms; inspirational quotes "Honey badger don't care" and "Honey badger don't give a shit"; the users' designs would have to be approved; use of the designs outside of the Randall's Honey Badger office store was prohibited; "[a]ll FanMerch products will be reviewed to ensure adherence to the guidelines provided for each FanMerch program"; and "Randall's Honey Badger and Zazzle reserve the right to remove any design for any reason[.]" | 153. Gordon decl., ¶ 53 . |
| 154. Zazzle would update Gordon on its FanMerch licensed products, and would also perform "sweeps" to remove infringing products. | 154. Gordon decl., ¶¶ 50, 52; emails September 9, 2014 - March 17, 2015. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| | |
| 155. Gordon has instructed Zazzle or its users to cease selling infringing items when discovered. | 155. Gordon decl., ¶ 51; email October 22, 2014, Ex. 73 to Gordon decl. |
| 156. Zazzle has at times asked Gordon for comment on styles of licensed products, and he has complied. | 156. Gordon decl., ¶ 52. |
| 157. Jeff Silberman ("Silberman") has been Gordon's literary agent since mid-2011. In mid-2011, Silberman was introduced to Gordon, and was aware of Gordon's Video and that his signature expressions in the Video, such as "Honey Badger Don't Care" and "Honey Badger Don't Give a Shit," had come to identify him and his alter ego, Randall, with the public. As such, Silberman thought Gordon would be a good client to have, and Silberman would be able to secure a book deal, and potentially other deals, to exploit Gordon's intellectual property rights. | 157. Jeff Silberman decl., ¶¶ 2-4. |
| 158. In December 2011, Silberman wanted to secure a license agreement for greeting cards on Gordon's behalf, but learned Gordon already made commitments with another licensing agent for a variety of categories of goods, including greeting cards. | 158. Silberman decl., ¶ 5. |
| 159. In July 2011, Silberman was negotiating with publishers HarperCollins and Andrews McMeel ("AM"), publishers of comic legends such as Doonesbury and The Far Side among other bestselling humor books, | 159. Silberman decl., ¶ 7. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| to secure a book deal for Gordon. Silberman received offers from both, and after discussing things with Gordon, pursued finalizing an agreement with AM, a quality publishing house that uses Simon & Schuster's sales force, to publish and distribute books. | |
| 160. On October 18, 2011, AM and Gordon entered into an agreement ("Book Agreement"), which Silberman negotiated on Gordon's behalf, pursuant to which Gordon authored a book called *Honey Badger Don't Care: Randall's Guide to Crazy Nastyass Animals* (the "book"), which was based on his Video and parodied a children's nature book, and AM was given the right to publish and distribute the book. | 160. Silberman decl., para. 8; Book Agreement, Ex. 106 to Silberman decl.; Gordon decl para 60 |
| 160. On December 15, 2011, AM and Gordon entered into an agreement ("Calendar Agreement"), which Silberman negotiated on Gordon's behalf, pursuant to which Gordon granted AM the right to manufacture and sell a wall calendar (the "calendar") based on his Video and signature phrases, including "Honey Badger Don't Care" and "Honey Badger Don't Give a Shit." Under the Calendar Agreement, AM provided Gordon an advance of $7,500. Additionally, Gordon was entitled to receive royalties based on AM's sales as specified in the Calendar Agreement. | 160. Silberman decl., ¶ 9; Calendar Agreement, Ex. 107 to Silberman decl.; Gordon decl., ¶ 62. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| | |
| 161. Gordon's book and calendar were distributed to mass market retail stores throughout the United States, such as Target and Wal-Mart. The products were also sold by Amazon, Ingram, Baker & Taylor, independent bookstores, and specialty stores across the country. | 161. Silberman decl., ¶ 10; Gordon decl., ¶ 63. |
| 162. Gordon's book was first sold in December 2011. The retail price of the book was about $14.99. | 162. Silberman decl., ¶ 21; Gordon decl. ¶ 67 |
| 163. Gordon's book is still being sold by Target, Wal-Mart and Barnes & Noble, among other retailers. | 163. Silberman decl., ¶ 10, 21; Gordon decl. ¶ 63. |
| 164. There is a trademark sign "TM" next to the phrase "Honey Badger Don't Care" on Gordon's book cover. In the first paragraph in the first page of the book, the paragraph ends, "Honey badger don't give a shit." | 164. Silberman decl., ¶ 11; Ex. 108 to Silberman decl.; Gordon decl., ¶ 64. |
| 165. On the cover of Gordon's calendar, it said, "Honey Badger Don't Care" with a TM symbol next to it. | 165. Gordon decl., ¶65. |
| 166. In January-February 2012, AM and Gordon had an extensive promotional and marketing campaign for Gordon's book. Gordon made many promotional appearances, through both radio appearances and at bookstores throughout the country. | 166. Silberman decl., ¶ 12; email dated January 17, 2012, Ex. 80 to Gordon decl.; Gordon decl., ¶ 66; email December 13, 2011, Ex. 77 to Gordon decl. |
| 167. In January-February 2012, AM produced posters for Gordon's book | 167. Silberman decl., ¶ 13; Poster, Ex. 109 to |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| signing events. | Silberman decl. |
| 168. In January-February 2012, AM issued a press release for Gordon's book. The press release stated in part, "Thanks to inimitable Internet sensation Randall, more than 30 million people know that Honey Badger takes what he wants (and he don't give a s***)." | 168. Silberman decl., ¶ 14; Press release, Ex. 110 to Silberman decl. |
| 169. In January-February 2012, AM also issued a "tip sheet" to promote the book. The tip sheet stated in part, "Celebrities, such as Howard Stern, Olivia Wilde, Tommy Lee, Ryan Gosling, Jason Alexander, Colin Hanks, Andy Dick and others, follow Randall on Twitter and all have spread the word about his work. Katy Perry has spread honey badger love in tweets and onstage "cause they don't give a s***." | 169. Silberman decl., ¶ 15; tip sheet, Ex. 111 to Silberman decl. |
| 170. In January-February 2012, AM also issued a "sell sheet" to promote the book. | 170. Silberman decl., ¶ 16; sell sheet, Ex. 112 to Silberman decl. |
| 171. There were many press clippings across the country, including articles by USA Today, Business Insider, International Business Times, and others, that referenced Gordon's book, Gordon (Randall) or the Video, which AM used to promote the book. | 171. Silberman decl., ¶ 17; press clippings, Ex. 113 to Silberman decl. |
| 172. In 2012, AM requested that Gordon appear at a book signing at the popular Comic Con festival in San Diego. Gordon did so. | 172. Silberman decl., ¶ 18. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| | |
| 173. In 2012, AM created a catalog which featured the book (among others). | 173. Silberman decl., ¶ 19; catalog, Ex. 14 to Silberman decl. |
| 174. In 2012, AM created and ran an advertisement in Shelf Awareness to promote the book. | 174. Silberman decl., ¶ 20; advertisement, Ex. 115 to Silberman decl. |
| 175. AM has sold approximately 27,718 units of Gordon's printed book, 594 units of Gordon's e-book, and 16,948 units of Gordon's calendar. The total gross sales revenue generated by AM for the book is approximately $209,000, while the total gross sales revenue generated by AM for the calendar is approximately $103,000, making AM's gross sales of Gordon's book and calendar in excess of $310,000. | 175. Silberman decl., ¶ 21; Gordon decl., ¶ 68. |
| 176. AM's gross sales of the book and calendar were only a fraction of the retailers' (e.g. Target, Wal-Mart, and Barnes & Noble) total gross sales. The retailers made approximately $418,000 from selling the printed book, an amount which does not include retail sales of the calendar or e-book. | 176. Silberman decl., ¶ 22. |
| 177. Gordon maintains a website, randallshoneybadger.com, on which consumers may be re-directed to his licensees, including The Duck Company, to purchase goods, and learn more about his character, Video and products. ; | 177. Gordon decl. ¶¶ 72, 74; website printout, Ex. 78 to Gordon decl. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| 178. In December 2011, Gordon created, along with a company called Medl Mobile, a "honey badger don't care" game "app." That month, he also created, along with a company called HandBaked Apps, a honey badger don't care soundboard and "Randall-gram" app. . | 178. Gordon decl., ¶ 73. |
| 179. RHB received advances on each of the licensing agreements, exceeding $100,000 on advances alone. | 179. Gordon decl., 69. |
| 180. In addition to advances, RHB received royalty payments based on a percentage of sales revenue generated by its licensees, who have generated in excess of $1,500,000 in sales revenue from selling licensed products. The gross sales of the licensees' retailers (e.g. Target) are multiples of that figure. | 180. Silberman decl., ¶ 22; Marine decl., ¶ 13; Leonhardt decl., ¶ 22; Gordon decl., ¶ 70. |
| 181. The two phrases that were used most often on officially licensed products were "Honey Badger Don't Care" and "Honey Badger Don't Give a Shit." | 181. Leonhardt decl., ¶ 25; Gordon decl., ¶ 71. |
| 182. Gordon and his licensees have sold numerous authorized goods bearing the phrase Honey Badger Don't Give a Shit, including: men's t-shirts; women's t-shirts; women's tank tops; baby bodysuits; infant t-shirts; hats; coffee mugs; keychains; magnets; stickers; mugs; plates; aprons; buttons; mouse pads; posters; greeting cards; and postcards. | 182. Gordon decl, ¶¶ 56, 58; advertisements of some authorized Honey Badger Don't Give a Shit goods, Ex. 74 to Gordon decl.; Honey Badger Don't Give a Shit postcard, Ex. 75 to Gordon decl. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| 183. Based on Gordon's extensive sales, promotions, and social media interactions, it is apparent that his signature phrases Honey Badger Don't Care and Honey Badger Don't Give a Shit are the most popular from his Video. | 183. Gordon decl., ¶¶ 3, 71. |
| 184. On April 1, 2015, Gordon received an email from a Google employee, Soham Patel, regarding the celebration of YouTube's 10th anniversary. Mr. Patel wrote to Gordon that for the celebration of YouTube's 10th birthday, it was creating graphical representations of some of the most monumental videos in YouTube's history. Mr. Patel wrote: Google was "interested in featuring an illustration of and text quote from [Gordon's] video 'The Crazy Nastyass Honey Badger (original narration by Randall)' on a series of uniquely designed tote bags, to be gifted to selected individuals...as part of the 10th birthday celebration. The bags will not be used for retail purposes or available for sale." Mr. Patel requested that the back of the bag state: "Honey badger don't care. Honey badger don't give a s**t!" Gordon agreed to let YouTube/Google use his signature phrases. | 184. Gordon decl., ¶ 151; email April 1, 2015, Ex. 94 to Gordon decl. |
| 185. The only relevance as to why a company would use the phrases "Honey Badger Don't Care" and "Honey Badger Don't Give a Shit" on products, including greeting cards, would be as a reference to Gordon | 185. Leonhardt decl., ¶ 27; Gordon decl., ¶ 152. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| (Randall) and his Video. | |
| 186. In July 2011, based on his popularity, including of his Video and catchphrases, Gordon was hired to perform in a commercial for Wonderful Pistachios that aired across the country, including during popular prime time shows such as Dancing with the Stars. | 186. Gordon decl., ¶ 75; video disc, Ex. 79 to Gordon decl. |
| 187. In November 2011, Gordon was hired by the channel Showtime to do a "voice over" for an advertisement for its hit television show Shameless. | 187. Gordon decl., ¶ 78. |
| 188. In 2011, Gordon appeared on the famous television show Extra, and was interviewed on ESPN Sports Center during a nationwide broadcast. | 188. Gordon decl., ¶¶ 81-82. |
| 189. In January - February 2012, Gordon went on an extensive promotional tour across the United States and made numerous media appearances throughout the country to promote his book and brand. At all of these events, he would promote his products, character Randall, and popular phrases of "Honey Badger Don't Care" and "Honey Badger Don't Give a Shit." | 189. Gordon decl., ¶¶ 84-87; January 17, 2012 email and attachment, Ex. 80 to Gordon decl. |
| 190. In about late 2011 or early 2012, Gordon appeared on the popular television show TMZ, which is broadcast nationally. | 190. Gordon decl., ¶ 88. |
| 191. In February 2012, Gordon was interviewed by ABC through its affiliate On The Red Carpet to make | 191. Gordon decl., ¶ 89. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| Oscar Predictions and answer questions about his Video, background and the like. . | |
| 192. On April 28, 2012, when Gordon's Video had about 43 million views on YouTube, he appeared at the Comedy Central Awards in New York, where he won an award for Best Mashup/Remix video. | 192. Gordon decl., ¶ 91. |
| 193. In July 2012, Gordon performed voice over work for the Bravo network for episodes of its popular show Real Housewives, and also appeared as a guest on the Bravo show Watch What Happens Live with Andy Cohen. Gordon recorded lines for the show, some of which included direct references to his phrase "honey badger don't give a shit". | 193. Gordon decl., ¶ 92; email August 7, 2012, Ex. 81 to Gordon decl; Cohen depo, 10:7 - 12:1; 18:18 - 19:6; 42:20 - 43:23. Reback Decl., Ex. 141. |
| 194. In August 2012, Gordon appeared on the popular television show America's Got Talent, which aired nationally on NBC during prime time hours, during which he narrated a video about the celebrity judges. | 194. Gordon decl., ¶ 93; video on disc, Ex. 79 to Gordon decl. |
| 195. In about 2012, representatives of Sarah Palin asked Gordon to do a video narration for her campaign. | 195. Gordon decl., ¶ 96. |
| 196. In 2012 and 2013, Gordon was interviewed on-air by ESPN about his Video and Tyrann Mathieu, a popular pro football player who became known as the Honey Badger based in part upon Gordon's Video. | 196. Gordon decl., ¶ 99. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| | |
| 197. From 2011 to the present, Gordon has given interviews for numerous national and well known publications including Forbes, Wall Street Journal and others. During almost all of his promotions and appearances, Gordon uses his signature phrases from his Video, including Honey Badger Don't Care and Honey Badger Don't Give a Shit. | 197. Gordon decl., ¶¶ 101-103. |
| 198. On March 4, 2011, The Huffington Post ran an article titled, "Honey Badger Don't Care: The Best Nature Video of All Time." | 198. Gordon decl., ¶ 105. |
| 199. On November 28, 2011, Advertising Age published an article about how Gordon's brand was one of "America's Hottest Brands." The article was titled, "Hot Brand? Honey Badger Don't Care", and states: "With the help of voice-over funny guy Randall (and/or comedian Chris Gordon), Honey Badger went from a bit player in a National Geographic special to a sassy, cobra-killing viral sensation. Honey Badger's got more than 23 million views on just one version of a video on YouTube. How many views does your brand have?" | 199. Gordon decl., ¶ 111. |
| 200. On December 10, 2011, the Wall Street Journal published an article about Tyrann Mathieu, who is nicknamed the Honey Badger, and interviewed Gordon for the article, which states: "Mathieu has been the beneficiary of the funniest, spontaneous and off-color | 200. Gordon decl., ¶ 112. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| Heisman marketing campaign of all time. The story begins in January, when a Los Angeles man posted a three-minute video on YouTube. ... Viewers of the rather graphic video are treated to scenes of honey badgers ... biting the heads off venomous snakes. But what stands out about this particular video is the narrator, a man who calls himself 'Randall.' ... he goes on to offer a saucy—and sometimes R-rated—running commentary on its activities. 'Eeew what's this in its mouth?' Randall recoils. 'Oh, it's got a cobra!' And in another sequence, 'Oh, that's nasty!' The video, which is approaching 27 million hits, is on track to finish the year as one of YouTube's top-20 videos...." | |
| 201. On December 12, 2011, Anderson Cooper, during his nationwide television show Anderson Cooper 360 on CNN, said Gordon's Video was his "favorite one of the year" and put clips of Gordon's Video on his show, including Gordon's phrases "Honey Badger Don't Care" and "Honey Badger Don't Give a Shit". | 201. Gordon decl., ¶ 113. |
| 202. In January 2012, Vogue published an article about celebrity recording artist Taylor Swift, and in the article, Ms. Swift mentions she knows every line of Gordon's Video. The website jezebel.com picked up on this, and published an article stating: "...Swift asked writer Jonathan Van Meter if 'her cursing could be off the record,' | 202. Gordon decl., ¶ 114. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| and he obliged. Unlike honey badger, Taylor Swift do give a shit." | |
| 203. On February 2, 2012, Access Hollywood printed an article, stating, "With over 36 million hits on his 'The Crazy Nastyass Honey Badger' YouTube video alone, animal enthusiast Randall has become an Internet sensation, with legions of fans sassily adding his signature catchphrase, "Honey badger don't care!" to their everyday vernacular." | 203. Gordon decl., ¶ 115. |
| 204. On January 24, 2012, USA Today published an article titled, "Honey Badger Don't Care, but we do", which stated: "Chances are you're one of the more than 34 million people who've watched the antics of Honey Badger on YouTube, so you know what we're talking about when we say 'Ewwwwwwww!' Now the lovable and tenacious creature has his own book, Honey Badger Don't Care (Andrews McMeel, $14.95). The book is written by the singularly named Randall who is also the narrator of the YouTube video." The article concluded by noting Gordon's Video and book contain language that may not be appropriate for all age groups as there were "scenes of the honey badger munching on snakes" and other food sources, "But, as we all know, "Honey Badger Don't Care"!" | 204. Gordon decl., ¶ 120. |
| 205. On February 2, 2012, Anderson Cooper, again on his nationwide | 205. Gordon decl., ¶ 124. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| television show Anderson Cooper 360 on CNN, played a clip of Gordon's Video for his nationwide audience, and said, "honey badger don't care if it's an early spring or not." | |
| 206. Recently, on August 18, 2016, New York Magazine published an article titled "Trump's Honey-Badger Campaign", which mentioned that Donald Trump's campaign chairman, Stephen Bannon, chose as a symbol for himself and Breitbart News the honey badger, which, the article notes, is "the nasty little mammal that achieved viral fame in 2011 on YouTube...." The article notes that: "'Honey Badger don't give a shit' is the legend Bannon had engraved on sliver flasks handed out as party favors at a Breitbart event." The article concludes: "And it's unlikely Trump or Bannon will make much of an effort to dissuade [down-ballot Republicans]. After all, they don't give a shit." | 206. Gordon decl., ¶ 126. |
| 207. Also on August 18, 2016, CBS News published an article titled, "Donald Trump's campaign and the honey badger" which stated: "Remember that viral video about the honey badger from 2011? You know the one. First, the black-and-white African predator chases a jackal. Then, it follows a cobra up into a tree. Then, it ends up eating said cobra for dinner. And through it all, the sassy narration proclaims, 'Honey badger don't care… It just takes what it wants.' It may get | 207. Gordon decl., ¶ 127. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| more attention beyond its 79 million internet views in the coming days as a result of the recent shakeup at the top of Donald Trump's campaign." The article mentions that Mr. Bannon's motto for Breitbart was, "Honey badger don't give a s---", and concludes by stating: "Trump might frame it as his willingness to fly in the face of political correctness. His new campaign CEO is likely just to say,"Honey badger don't give a s---." | |
| 208. Numerous articles, including those disseminated in 2011 and early 2012, have been published across the country which link Gordon's catchphrase "honey badger don't give a shit" with Randall and the Video. | 208. Gordon decl., ¶¶ 76, 88, 107, 114, 121, 126, 127. |
| 209. Gordon has social media accounts on Twitter and Facebook under his alias, Randall, where he corresponds with fans from all over the country. He has about 831,000 "followers" on his Twitter account, meaning people who receive his Tweets, and will see his Tweets in their home time line whenever they log in to Twitter. | 209. Gordon decl., ¶ 128. |
| 210. Gordon's Twitter account is "verified", meaning there is a blue verified badge on my Twitter page which lets people know that an account of public interest is authentic, and he has 824 verified followers, including well known celebrities and personalities, such as Carolyn Kennedy, Richard Lewis, Nancy Sinatra, David Hasselhoff, | 210. Gordon decl., ¶¶ 129-130. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| Edward James Olmos, and Danica Patrick. | |
| 211. The Duck Company is aware that Gordon has a legion of fans and online followers on Facebook, Twitter, and the YouTube channel, and is "aware of the fact that...he [Gordon] is an online celebrity" and is internet famous. | 211. Levitina depo, 68:19 - 70:19; 111:22 - 112:7. Reback Decl., Ex. 139. |
| 212. Gordon's licensees frequently ask him to promote their licensed goods on his social media accounts, and he has been repeatedly told their sales increased after his promotions. For instance, if The Duck Company has a sale, Ms. Levitina will contact Gordon so he can promote it on social media, as her boss told her to email Gordon regarding sales because "we noticed that he sent out a tweet with one of our shirts, and then like we sold a lot of shirts that afternoon" so it was "better to just start emailing him every time we had a sale." | 212. Levitina depo, 21:21 - 24:1; Reback Decl., Ex. 139. Gordon decl., ¶¶ 35-36, 131; email November 6, 2013, Ex. 59 to Gordon decl.; emails October 13, 2015 - December 11, 2015, Ex. 60 to Gordon decl. |
| 213. Gordon uses his popular social media platforms to promote his merchandise. For instance, The Duck Company would see sales "pop up" right after Gordon would promote the goods on social media; they noticed an "uptick in sales when he sent out the tweets." "Usually, anytime he posts something funny about it, about us, I did notice an increase in sales." | 213. Levitina depo, 76:5 - 78:9; Reback Decl., Ex. 139. Gordon decl., ¶ 34; Anderson depo, 8:24 - 9:17; 17:22 - 18:20; 23:21 - 24:23; 47:15-22; Reback Decl., Ex. 138. Green depo, 50:15 - 51:12. Reback Decl., Ex. 140. |
| 214. In the year 2011 alone, Gordon received numerous, unsolicited posts | 214. Gordon decl., ¶ 131; Facebook posts sent to |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| on his Facebook account, in which fans of his would post references to his signature phrase Honey Badger Don't Give a Shit and message him. | Gordon referencing Honey Badger Don't Give a Shit, Ex. 84 to Gordon decl. |
| 215. Anderson has witnessed Gordon's goodwill and notoriety, including how individuals follow Gordon on social media because they like his Video; how Gordon's fans would post multiple photographs of themselves with honey badger merchandise; and how Gordon has made many public appearances in character as Randall. | 215. Anderson depo, 41:6 - 44:20. Reback Decl., Ex. 138. |
| 216. Randall's brand included the phrases "honey badger don't care" and "honey badger don't give a shit", which are associated with Randall and the Video. | 216. Cohen depo, 46:17 - 49:15. Reback Decl., Ex. 141. |
| 217. Plaintiff served interrogatories on Defendants, asking them to identify each person who was involved in developing or creating any of the subject greeting cards, and to describe the involvement of each person. DCI responded, stating Tom Drape, DCI's President, developed the content for the cards, "with the assistance of Scott Oppenheimer, DCI editor and writer, and Tim McCabe, DCI artist." DCI also identified Noelle Shannon, Maria MacNamara, and Alana Campana, Leah Lee and Christina Ng, as individuals who assisted with the development and creation of the cards. PRG identified the same persons as having knowledge regarding the development and creation of the cards. | 217. Interrogatory No. 6, Exs. 133, 134, 135, and 136 to Reback decl. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| 218. DCI creates greeting cards and licenses them, but does not sell them. | 218. Drape Depo. 13:9-17. Reback Decl., Ex. 143. |
| 219. DCI owns all copyright, trademark and other intellectual property rights in the greeting cards that it licenses to PRG. | 219. Drape Depo. 160:4-24; Exh. 1 at 8, Section Nine. Reback Decl., Ex. 143. |
| 220. DCI's President, Thomas Drape ("Drape"), contends that he does not know if he has ever been inspired by something he found on the internet to create a greeting card. | 220. Drape Depo. 10: 10-12; 46:4-7. Reback Decl., Ex. 143. |
| 221. Drape contends that he has never watched YouTube. | 221. Drape Depo. 46:8-24. Reback Decl., Ex. 143. |
| 222. Drape contends that he came up with the idea for the greeting card AGIN No. 5012925 (hereafter "Honey Badger Critter Card"). | 222. Drape Depo. 23:1-4, Exh. 8. Reback Decl., Ex. 143. |
| 223. Drape does not remember how he came with the idea for the Honey Badger Critter Card. | 223. Drape Depo, 23:23-25. Reback Decl., Ex. 143. |
| 224. Drape contends that he wrote the text of the Honey Badger Critter Card. | 224. Drape Depo. 26:20-22; 28: 2-5. Reback Decl., Ex. 143. |
| 225. Drape does not recall his creative process that resulted in the text of the Honey Badger Critter Card. | 225. Drape Depo. 27; 1-4. Reback Decl., Ex. 143. |
| 226. Drape does not recall anything that inspired him to write the text that appears on the Honey Badger Critter Card. | 226. Drape Depo. 27:1-4. Reback Decl., Ex. 143. |
| 227. The text of the Honey Badger Critter Card states, among other things, on the | 227. Drape Depo., Exh. 8. Reback Decl., Ex. 143. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| front page: "Honey Badger @don'tgiveash*t Today Just Killed a cobra. Don't give a sh*t" | |
| 228. The transcript of the copyrighted narration of Gordon's Video states in part: "The honey badger's been referred to by the Guiness Book of World Records as the most fearless animal in all the animal kingdom. It really doesn't give a shit. If it's hungry, it's hungr-ew what's that in its mouth! Oh it's got a cobra? Oh it runs backwards? Now watch this, look, a snake's up in a tree. Honey Badger don't care. Honey badger don't give a shit." | 228. Gordon decl., ¶ 3, Exh. 41. |
| 229. The Honey Badger Critter Card also states, among other things, on the front page: "Honey Badger@don'tgiveash*t Today Rolling in fire ants. Don't give a sh*t." | 229. Drape Depo. 23:1-4, Exh. 8. Reback Decl., Ex. 143. |
| 230. The transcript of the narration of Gordon's Video states in part: "Now look, here's a house full of bees. You think honey badger cares? It doesn't give a shit. It goes right in to the house full of bees. You think the honey badger cares? It doesn't give a shit." | 230. Gordon decl., ¶¶ 3-4; Exhs. 81 and 82. |
| 231. Drape contends that he discussed the text of the Honey Badger Critter Card with his senior staff persons Tim McCabe ("McCabe") an artist, and/or Scott Oppenheimer ("Oppenheimer") a meeting he has each morning, but does | 231. Drape Depo. 33: 3-15. Reback Decl., Ex. 143. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| not recall anything that was discussed about it. | |
| 232. McCabe has been employed as an artist by DCI since 2000. | 232. McCabe Depo. 9:16-25;10:1-9. Reback Decl., Ex. 148. |
| 233. Oppenheimer has been employed as a writer by DCI since at least 1992. | 233. Oppenheimer Non-Confidential Depo. 10:24-11:1-18. Reback Decl., Ex. 149. |
| 234. Neither McCabe, nor Oppenheimer recall having daily meetings at DCI in 2012, McCabe Depo. 13:15-14:8; | 234. Oppenheimer Confidential Depo. 4:14-23. Reback Decl., Ex. 149. |
| 235. McCabe created the artwork and lettering for the design of the Honey Badger Critter Card. | 235. McCabe Depo. 40:4-41:10; Exh. 76. Reback Decl., Ex. 148. |
| 236. McCabe does not recall discussing the design for the Honey Badger Critter Card with Drape or Drape providing him any information for the design of the card. | 236. McCabe Depo. 41:11-24; Exh. 76. Reback Decl., Ex. 148. |
| 237. DCI's design for the Honey Badger Critter Card stated on the front page: "http:www.critter.com/honeybadger", but the version of the Honey Badger Critter Card that PRG distributed to retailers did not include the reference to http:www.critter.com/honeybadger" | 237. McCabe Depo. 41:25–42:24, Exh 76; Reback Decl., Ex. 148. Drape Depo, 23:1-4, Exh. 8. Reback Decl., Ex. 143. |
| 238. Oppenheimer does not recall seeing the design for the Honey Badger Critter Card. discussing any of the text that appears on the design for the Honey Badger Critter Card with anyone at | 238. Oppenheimer Confidential Depo. 20:6-21:1. Reback Decl., Ex. 149. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| DCI or Drape showing him a handwritten copy of the text that appears on the design for the Honey Badger Critter Card. | |
| 239. Drape contends that his idea for the Honey Badger Critter Card was not based on the Gordon Video. | 239. Drape Depo. 35:3-6. Reback Decl., Ex. 143. |
| 240. Drape contends that he had never heard of the title of Gordon's Video until the day before his deposition in this case on August 17, 2016, but that he may have heard about a humorous narration that had become a viral video prior to the time he came up with the idea for the Honey Badger Critter Card. | 240. Drape Depo. 35:9-25. Reback Decl., Ex. 143. |
| 241. The price listed on the Honey Badger Critter Card is $2.97. | 241. Drape Depo., Exh 8. Reback Decl., Ex. 143. |
| 242. DCI designed the greeting card with AGIN No. 4945020 they were sold under DCI's Tomato Cards brand (" Honey Badger Election Card"). | 242. Drape Depo. 41:10-23. Exh. 11. Reback Decl., Ex. 143. |
| 243. Drape contends that he wrote the copy, including the phrase "Honey Badger Don't Give $#%@!" that appears on the Honey Badger Election Card. | 243. Drape Depo. 42:10-44:3; Exh. 11. Reback Decl., Ex. 143. |
| 244. Drape does not remember what inspired him to come up with the idea for the Honey Badger Election Card. | 244. Drape Depo. 45:19-22, Exh. 11. Reback Decl., Ex. 143. |
| 245. McCabe created the artwork and lettering for a version of the design of the Honey Badger Election Card that | 245. McCabe Depo. 35:24-36:12; Exh. 75. Reback Decl., Ex. 148. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| states in part: "Honey Badger and me just don't care." | |
| 246. Drape provided McCabe the information to use to create a version of the design of the Honey Badger Election Card that states in part: "Honey Badger and me just don't care" | 246. McCabe Depo. 36:16-20; Exh. 75. Reback Decl., Ex. 148. |
| 247. Drape did not tell McCabe why the phrase "Honey Badger and me just don't care" was used on that version of the design for the Honey Badger Election Card. | 247. McCabe Depo. 36:24-37: Exh. 75. Reback Decl., Ex. 148. |
| 248. McCabe does not recall any discussion with Drape about the version of the Honey Badger Election Card that states in part: "Honey Badger and me just don't care." | 248. McCabe Depo. 25:7-13, Exh. 75. Reback Decl., Ex. 148. |
| 249. Oppenheimer did not write any copy on the version of the design of the Honey Badger Election Card that states in part: "Honey Badger and me just don't care", had not seen the card as of the time of his deposition in this action on September20, 2016 and does not recall discussing the phrase "Honey Badger and me just don't care" with anyone at DCI . | 249. Oppenheimer Confidential Depo. 15:15-23; 18:19-19:14; Exh. 75. Reback Decl., Ex. 149. |
| 250. McCabe created a version of the design of the Honey Badger Election Card that states in part: "Me and Honey Badger just don't give a $#%@!." | 250. McCabe Depo. 37:23-38:6; Exh. 86. Reback Decl., Ex. 148. |
| 251. McCabe does not know why the phrase "Me and Honey Badger just don't give | 251. McCabe Depo. 39:7-11; Exh. 86. Reback Decl., Ex. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| a $#%@!" appears on the design for the Honey Badger Election Card. | 148. |
| 252. McCabe does not recall having a discussion with Drape or anyone else about the version of the design of the Honey Badger Election Card that states in part: "Me and Honey Badger just don't give a $#%@!." | 252. McCabe Depo. 39:19-25; Exh. 86. Reback Decl., Ex. 148. |
| 253. Oppenheimer had not seen the version of the design of the Honey Badger Election Card that states in part: "Me and Honey Badger just don't give a $#%@!" as of the time of his deposition in this action on September20, 2016 and does not recall discussing the phrase "Me and Honey Badger just don't give a $#%@!" with anyone at DCI . | 253. Oppenheimer Confidential Depo.15:15-23; 19:15-20:5; Exh. 86. Reback Decl., Ex. 149. |
| 254. The price listed on the Honey Badger Election Card is $2.99. | 254. Drape Depo., Exh. 11. Reback Decl., Ex. 143. |
| 255. DCI designed the greeting cards with AGIN No.s 4935338 and 4936683 and they were sold under DCI's Tomato Cards brand (" Honey Badger Birthday Card(s)"). | 255. Drape Depo. 41:10-23. Exhs. 9 and 10. Reback Decl., Ex. 143. |
| 256. Drape contends that he wrote the copy, including the phrase "Honey Badger Don't Give a Sh*t" that appears on the Honey Badger Birthday Cards. | 256. Drape Depo. 43:19-44:3; Exh.s 9 and 10. Reback Decl., Ex. 143. |
| 257. Drape does not remember what inspired him to come up with the idea for the Honey Badger Birthday Cards. | 257. Drape Depo. 45:11-18, Exhs. 9 and 10. Reback Decl., Ex. 143. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| 258. McCabe created the artwork and lettering for the design of the Honey Badger Birthday Card. | 258. McCabe Depo. 28:13-29:3, 30:19-31:5, Exhs 9 and 84. Reback Decl., Ex. 148. |
| 259. McCabe does not recall having a discussion with Drape or anyone else about the design for the Honey Badger Birthday Card. | 259. McCabe Depo. 29:19-25; Exh. 84. Reback Decl., Ex. 148. |
| 260. Oppenheimer did not write any copy on the design of the Honey Badger Birthday Card, had not seen the card as of the time of his deposition in this action on September20,2016 and had not discussed honey badger greeting cards with anyone at DCI. | 260. Oppenheimer Confidential Depo. 15:15-23; 17:8-24; Exh. 84. Reback Decl., Ex. 149. |
| 261. The price listed on the Honey Badger Birthday Card AGIN No. 4935338 is $2.74. | 261. Drape Depo., Exh. 10. Reback Decl., Ex. 143. |
| 262. The price listed on the Honey Badger Birthday Card AGIN No. 4936683 is $2.99. | 262. Drape Depo., Exh. 9. Reback Decl., Ex. 143. |
| 263. Drape contends that he wrote the text "Honey Badger Don't Give A Sh*t." that appears on the greeting card with AGIN No. 5223201 ("Freaky Wild Honey Badger Card"), but did not discuss it with anyone. | 263. Drape Depo. 51:19-25; 52:6, Exh. 12. Reback Decl., Ex. 143. |
| 264. Drape does not know what inspired him to create the Freaky Wild Honey Badger Card. | 264. Drape Depo. 52:7-9. Reback Decl., Ex. 143. |
| 265. McCabe created the artwork and lettering for the design of the Freaky Wild Honey Badger Card. | 265. McCabe Depo. 34:7-21; Exh. 85. Reback Decl., Ex. 148. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| | |
| 266. McCabe does not recall having a discussion with anyone about the design for the Freaky Wild Honey Badger Card. | 266. McCabe Depo. 35:3-12; Exh. 85. Reback Decl., Ex. 148. |
| 267. No one ever told McCabe why the phrase "Honey Badger Don't Give A Shit" was used on the design for the Freaky Wild Honey Badger Card. | 267. McCabe Depo. 35:13-16; Exh. 85. Reback Decl., Ex. 148. |
| 268. Oppenheimer did not write any copy on the design of the Freaky Wild Honey Badger Card, had not seen the card as of the time of his deposition in this action on September20, 2016 and does not recall discussing any honey badger greeting cards with anyone at DCI . | 268. Oppenheimer Confidential Depo. 15:15-23; 17:25-18:18; Exh. 85. Reback Decl., Ex. 149. |
| 269. DCI designed the greeting cards with AGIN No.s 4917247 and 5049731 and they were sold under DCI's Tomato Cards brand (" Honey Badger Halloween Card(s)"). | 269. Drape Depo. 41:10-23. Exhs. 6 and 7. Reback Decl., Ex. 143. |
| 270. "Tomato Cards" is a brand of greeting cards that DCI creates. | 270. Drape Depo. 13:9-15. Reback Decl., Ex. 143. |
| 271. Drape contends that he wrote the copy, including the phrase "Honey Badger Don't Give a Shit" that appears on the Honey Badger Halloween Card AGIN No. 491724 . | 271. Drape Depo. 42:10-44:3. Reback Decl., Ex. 143. |
| 272. Drape does not remember what inspired him to come up with the idea for the Honey Badger Halloween Cards. | 272. Drape Depo. 45:2-10, Exhs. 6 and 7. Reback Decl., Ex. 143. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| 273. McCabe created the artwork and lettering for the design of the Honey Badger Halloween Card. | 273. McCabe Depo. 23:4-24; Exh. 83. Reback Decl., Ex. 148. |
| 274. McCabe does not know how Drape came up with the text that appears on the design for the Honey Badger Halloween Card. | 274. McCabe Depo. 25:7-13, Exh. 83. Reback Decl., Ex. 148. |
| 275. McCabe does not recall if Drape ever told him why the phrase "Honey Badger Don't Give a Shit" appears on the design for the Honey Badger Halloween Card. | 275. McCabe Depo. 25:7-19 Exh. 83. Reback Decl., Ex. 148. |
| 276. Oppenheimer did not write any copy on the design of the Honey Badger Halloween Card, had not seen the card as of the time of his deposition in this action on September20,2016 and had not discussed any honey badger greeting cards with anyone at DCI. | 276. Oppenheimer Confidential Depo. 15:15-23; 15:24-16:14; Exh. 83. Reback Decl., Ex. 149. |
| 277. Oppenheimer did not discuss anything about the design for the Honey Badger Halloween Card with Drape. | 277. Oppenheimer Depo. 16:15-17; Exh. 83. Reback Decl., Ex. 149. |
| 278. The price listed on the Honey Badger Halloween Card AGIN No. 4917247 is $2.97. | 278. Drape Depo. Exh. 7. Reback Decl., Ex. 143. |
| 279. The price listed on the Honey Badger Halloween Card AGIN No. 5049731 is $3.29. | 279. Drape Depo. Exh. 6. Reback Decl., Ex. 143. |
| 280. In Gordon's Video, he makes repeated references to the honey badger eating and not fearing a cobra. For instance, some of his lines in the Video include: | 280. Gordon decl., ¶ 137; transcription of narration, Exhibit 41 to Gordon decl. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
| --- | --- |
| "Ew it's got a snake?" "Oh it's got a cobra?" "And it eats the snakes." "Eating snakes!" "Here comes a fierce battle between a king cobra and a honey badger." "Get away from me! Says the snake." "The snake comes back and it lashes right at the honey badger." "It's been bitten by the snake, so while it's eating the snake - ew, that's disgusting." "...the honey badger gets right back up and continues eating the cobra!" "And of course, what does a honey badger have to eat for the next few weeks? Cobra." | |
| 281. Gordon sold a Honey Badger Don't Care "Cobra t-shirt" through The Duck Company. On November 1, 2013, Ms. Levitina of The Duck Company emailed Gordon, asking him to "tweet out Honey Badger Cobra" and she provided an image of the design, which contained a honey badger holding a cobra. Later that day, she emailed Gordon, "Just found out we're bringing back Honey Badger Christmas (the t-shirt & greeting card) some time next week....Since they'll be on sale for a while I think that'll be a good thing to promote after Honey Badger Cobra." | 281. Gordon decl., ¶ 138; email November 1, 2013, Ex. 89 to Gordon decl. |
| 282. Numerous articles have made references to cobras when talking about Gordon or his Video. | 282. Gordon decl., ¶¶ 91, 111, 112, 118, 120, 127, 139. |
| 283. A consumer who bought two of Defendants' cards in 2014 at a Target store believed Gordon actually produced the cards. | 283. Jacqueline Harpole decl., Ex. 126 to Reback decl. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| | |
| 284. Twenty-eight (28) individuals have declared under penalty of perjury that they: are greeting card consumers; reviewed Defendants' cards; have viewed Gordon's Video ("The Crazy Nastyass Honey Badger (original narration by Randall)") and are aware he created it; first learned of the phrases "Honey Badger Don't Care" and "Honey Badger Don't Give a Shit" from the Video; and believe Gordon (Randall) either produced Defendants' cards, was affiliated with the cards, sponsored or approved them. | 284. Consumer declarations, Ex. 127 to Reback decl. |
| 285. Gordon received inquiries from his fans and social media followers who believed Defendants' cards were affiliated with him. | 285. Gordon decl., ¶¶ 132-136; Exhs. 85-88 to Gordon decl. |
| 286. On August 17, 2015, on his Twitter account, Gordon received an unsolicited "tweet" from someone named Lynette Villalobos, who wrote to Gordon: "@Randallsanimals look what we found", and attached a copy of one of Defendants' greeting cards. | 286. Gordon decl., ¶ 133; Ex. 85 to Gordon decl. |
| 287. On October 21, 2012, on Twitter, Gordon received a "tweet" from Emma Gallo, who wrote: "@Randallsanimals, I saw a honey badger birthday card at target the other day. Also, I got a honey badger shirt just to show the love." | 287. Gordon decl., ¶ 134; Ex. 86 to Gordon decl. |
| 288. On November 8, 2014, on Facebook, Gordon received a message from | 288. Gordon decl., ¶ 135; Ex. 87 to Gordon decl. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| Joseph Roling, who attached an image of one of Defendants' greeting cards, and wrote: "I hope you're getting royalties from this stuff." | |
| 289. On October 15, 2014, Gordon received a "tweet" from someone who goes by the name (on Twitter) of Possum. She wrote: "@Randallsanimals The SIL was at Rite Aid and saw a line of Honey Badger greeting cards ... is this your handiwork?" After Gordon replied, "no," she responded, "People just riding off your name...." | 289. Gordon decl., ¶ 136; Ex. 88 to Gordon decl. |
| 290. On July 18, 2014, Plaintiff sent a cease and desist letter to DCI. In the letter, Plaintiff advised DCI, among other things, that Plaintiff is the owner of the federally registered trademark of "Honey Badger Don't Care", and that DCI's greeting cards infringed on Plaintiff's mark, including by using the phrase "Honey Badger Don't Give a Shit". Plaintiff demanded, among other things, that DCI cease and desist using Plaintiff's mark in any manner whatsoever, including in connection with DCI's sales of merchandise. | 290. J. Smith decl., ¶ 2; Ex. 116 to J. Smith decl. |
| 291. On July 23, 2014, Tom Drape, President of DCI, sent an email to Plaintiff's counsel, Jeremy Smith. Mr. Drape claimed DCI has "not done a card using the words 'Honey Badger Don't Give a Shit'" | 291. J. Smith decl., ¶ 3; Ex. 117 to J. Smith decl. |
| 292. On July 25, 2014, Mr. Drape again emailed Mr. Smith, stating DCI has | 292. J. Smith decl., ¶ 3; Ex. 117 to J. Smith decl. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| "not done any cards using" the phrase Honey Badger Don't Give a Shit. Also in his email dated July 25, 2014, Mr. Drape referred to a "major published interview" of Gordon. | |
| 293. On December 23, 2014, PRG began having allegedly privileged internal communications regarding Gordon's infringement claims. | 293. Defendants' Privilege Log, Ex. 137 to Reback decl. |
| 294. On June 30, 2015, Gordon filed his Complaint against Defendants. | 294. Dkt. No.1. |
| 295. Despite the above, Defendants' greeting cards were still being sold in retail stores in the Spring of 2016. | 295. Declaration of Aaron Siegel (Dkt. No. 59, at ¶ 13); Albertsons Email, Ex. 128 to Reback decl. |
| 296. In response to the survey conducted by Defendants' expert Hal Poret ("Poret survey"), Gordon designated David Stewart, Ph.D. ("Dr. Stewart") as an expert witness, and he produced an Expert Report of David Stewart, Ph.D. dated August 31, 2016 ("Stewart Report"). | 296. Stewart Report, Ex. 125 to Reback decl. |
| 297. Dr. Stewart opines that the Poret survey is fatally flawed, irrelevant and should be accorded no weight for a variety of reasons, including because it used a design (Eveready) which is appropriate for universally known brands like Disney, McDonalds and Nike, but inappropriate to use in the circumstances of this case. As such, the Poret survey was "preordained to find little evidence of consumer | 297. Stewart Report, Ex. 125 to Reback decl., at ¶¶ 18-19. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
| --- | --- |
| confusion [and] is evidence of bias and stage management and is inconsistent with the objectivity required in the design of valid surveys." | |
| 298. The Poret survey is also fundamentally flawed because it did not reflect market conditions, particularly because both Gordon and Defendants sell their goods in the same retail stores (e.g., Target and Wal-Mart), but the Poret survey never exposed the survey participant to any of Gordon's goods. | 298. Stewart Report, Ex. 125 to Reback decl., at ¶ 20. |
| 299. The Poret survey is also fundamentally flawed because it did not focus on the phrase at issue in this case, specifically, survey participants were never asked a question about the signature phrase "Honey Badger Don't Give a Shit". | 299. Stewart Report, Ex. 125 to Reback decl., at ¶ 21. |
| 300. The Poret survey is also fundamentally flawed because it did not test the registered trademark at issue in the present matter ("Honey Badger Don't Care"). Indeed, there was no reference to Gordon's registered trademark anywhere in the Poret survey. Because the survey did not test the likelihood of consumer confusion related to the registered mark at issue, the survey is irrelevant. | 300. Stewart Report, Ex. 125 to Reback decl., at ¶¶ 21, 28. |
| 301. The Poret survey is also fundamentally flawed because it did not conduct an objective survey of all of the relevant greeting cards in the present matter, specifically, Mr. Poret selected only one of the seven greeting cards that are | 301. Stewart Report, Ex. 125 to Reback decl., at ¶¶ 22, 28. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| at issue in the present matter, and he provides no rationale for selecting the one greeting card he did test and he offers no evidence that the card he did select was representative of the other six. | |
| 302. The Honey Badger Critter Card was not used in the Poret survey. | 302. Reback decl., at __. |
| 303. The Poret survey did not test Defendants' "Critter" card, which uses language very similar to narration of Randall (Mr. Gordon), including references to a cobra. | 303. Stewart Report, Ex. 125 to Reback decl., at ¶ 22. |
| 304. Even if the Poret survey were appropriate and valid, which it is not, the survey results must be limited to a single greeting card and provides no evidence regarding the other six greeting cards at issue. | 304. Stewart Report, Ex. 125 to Reback decl., at ¶ 23. |
| 305. The Poret survey is also fundamentally flawed because it did not define an appropriate population, specifically, Mr. Poret (a) should have used a research design that exposed respondents to both the senior Gordon mark ("Honey Badger Don't Care") and the alleged infringing mark in either a side-by-side or sequential presentation, (b) used a population sample that did not even represent the greeting card population, and (c) used a sample that was unlikely to have exposure to Gordon's senior mark. | 305. Stewart Report, Ex. 125 to Reback decl., at ¶¶ 24-25. |
| 306. The Poret survey is also fundamentally | 306. Stewart Report, Ex. 125 to |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| flawed because its question protocol was leading and mis-directed answers of respondents. | Reback decl., at ¶ 26. |
| 307. The Poret survey is also fundamentally flawed because Mr. Poret failed to use any type of proper control, specifically, an appropriate control would have removed the catch phrase from the card. Instead, Mr. Poret improperly used as a control the same exact card but simply added a disclaimer. | 307. Stewart Report, Ex. 125 to Reback decl., at ¶ 27. |
| 308. Gordon has vigorously enforced his intellectual property rights by, among other things, sending numerous cease and desist letters to alleged infringing companies, and filing approximately 20 lawsuits to enforce his rights. | 308. Gordon decl., ¶¶ 141-142; Reback decl., ¶ 25; Cease and desist letters, Ex. 130 to Reback decl. |
| 309. In Gordon's prior 20 or so lawsuits to enforce his rights, some of the defendants used the phrase "Honey Badger Don't Care", some used "Honey Badger Don't Give a Shit", and some used phrases confusingly similar thereto. Some of the defendants sold goods that included classes where he holds a registered trademark (e.g., clothes), and others where he did not (e.g., blankets/throws and pillows). The infringing part was not that the companies sold goods bearing a reference to honey badgers, but rather that they sold goods bearing Honey Badger Don't Care, Honey Badger Don't Give a Shit, or phrases confusingly similar thereto, as the public associates those signature | 309. Gordon decl., ¶ 141. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| phrases in Gordon's Video with Gordon/Randall and his goods. | |
| 310. All defendants in all of Gordon's prior lawsuits have settled, except for the defendants in this action. | 310. Gordon decl., ¶ 141. |
| 311. Tianyi Wang Goudey ("Goudey") owns TISELLE letterpress + design, a greeting card company which made a card that had the phrase "honey badger don't give a shit". | 311. Goudey depo, 10:13 - 11:2; 15:6-21. Reback Decl., Ex. 142. |
| 312. Tiselle created its "honey badger don't give a shit" card because Goudey's "husband was quoting the honey badger in 2012. He and his co-worker were quoting it all day long....". | 312. Goudey depo, 24:4-11; 52:24 - 53:7. Reback Decl., Ex. 142. |
| 313. Goudey first learned of the phrase "honey badger don't give a shit" from her husband, who was quoting it from Gordon's Video. | 313. Goudey depo, 53:8 - 55:11; 57:14 - 58:6. Reback Decl., Ex. 142. |
| 314. Goudey never used the phrase "honey badger don't give a shit" before Gordon's Video. | 314. Goudey depo, 61:25 - 62:2. Reback Decl., Ex. 142. |
| 315. Two well known phrases from Gordon's Video are "honey badger don't care" and "honey badger don't give a shit." | 315. Goudey depo, 58:8 - 59:3. Reback Decl., Ex. 142. |
| 316. In 2012, when Goudey created the cards, she had reason to believe there possibly was a trademark on "honey badger don't give a shit." | 316. Goudey depo, 29:15 - 30:4. Reback Decl., Ex. 142. |
| 317. In connection with the production of | 317. Goudey depo, 74:9 - 78-6. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| Tiselle's cards, Goudey performed trademark searches for two phrases: "honey badger don't care" and "honey badger don't give a shit". | Reback Decl., Ex. 142. |
| 318. Gordon did not permit Tiselle to make greeting cards bearing the phrase Honey Badger Don't Give a Shit. Gordon cannot recall when he first saw Tiselle's card, although he assumed his former counsel sent a cease and desist letter to Tiselle. Tiselle's name resurfaced when its representative's deposition was taken in this case by Defendants, and immediately after learning facts at the deposition, Gordon's current attorneys sent Tiselle a cease and desist letter. | 318. Gordon decl., ¶ 143; Reback decl., ¶ 24; Tiselle cease and desist, Ex. 129 to Reback decl. |
| 319. Tiselle settled with Gordon before a lawsuit was required, and under the settlement agreement, Tiselle agreed to pay a settlement sum, but because it lacked sufficient funds to pay the money, Tiselle was permitted to continue selling its card until July 1, 2017 provided Tiselle also pay Gordon 33% of the card's gross sales. Additionally under the settlement agreement, Tiselle agreed to forever refrain from selling merchandise bearing Honey Badger Don't Give a Shit after the July 1, 2017 sell-off period expires. | 319. Gordon decl., ¶ 143; Tiselle settlement, Ex. 90 to Gordon decl. |
| 320. Before Defendants' summary judgment motion, Gordon had never heard of a company called someecards that purportedly allows consumers to create | 320. Gordon decl., ¶ 144. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| Honey Badger Don't Give a Shit greeting cards on someecards.com, as argued by the Defendants in this case in their summary judgment motion. Gordon's attorneys will investigate the matter and send a cease and desist letter if warranted. | |
| 321. Gordon's Video contains footage that came from a documentary called The Snake Eaters of the Kalahari, which was shot by Colleen and Keith Begg. Soon after Gordon published the Video, the Beggs reached out to him and thanked him for helping to do in a couple minutes what they had been trying to do in 10 years. The Beggs also wrote the Foreword in Gordon's book, in which the Beggs wrote: "Randall has done what we could not. He has grabbed the attention of audiences through creature comedy, capturing the imaginations of millions of viewers that mainstream media typically misses out on." | 321. Gordon decl., ¶¶ 61, 145. |
| 322. National Geographic has never claimed Gordon's Video infringes any of its rights. To the contrary, Gordon spoke with numerous personnel of National Geographic between the years 2011-2012, had an in-person meeting with National Geographic personnel on August 3, 2012 about working on a joint project, and exchanged numerous emails with National Geographic personnel in 2011 and 2013 about potential collaborations. National Geographic personnel never told | 322. Gordon decl., ¶¶ 146-150; message reminder printout re: National Geographic meeting, Ex. 91 to Gordon decl; emails September 13, 2011 to October 20, 2011, Ex. 92 to Gordon decl; emails April 17-22, 2013, Ex. 93 to Gordon decl. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| Gordon he was infringing any of National Geographic's rights, but rather wanted to work with him on potential projects. | |
| 323. According to Ms. Janice Ross' LinkedIn profile, she is the Head of Global Licensing for American Greetings' Properties, and she develops licensing and merchandising strategies for the American Greetings Properties portfolio and oversees the execution of that strategy for all consumer products activities. From September 2004 to the present, she was Vice President for Brand Marketing at American Greetings, in which capacity she provided strategic planning and leadership around all aspects of AG Properties' global branding, marketing and public relation programs. | 323. Reback decl., ¶ 44; Ross LinkedIn profile, Ex. 44 to Reback decl. |
| 324. American Greetings' major greeting card lines include Recycled Paper Greetings and Papyrus. | 324. Reback decl., ¶ 45; American Greetings website printout, Ex. 151 to Reback decl. |
| 325. American Greetings has one of the largest collections of greeting cards on the internet, including greeting cards available at Cardstore.com and ecards available at AmericanGreetings.com. | 325. Reback decl., ¶ 45; American Greetings website printout, Ex. 151 to Reback decl. |
| 326. According to American Greetings, all of its cards are "designed to meet consumers' needs to connect, express and celebrate." | 326. Reback decl., ¶ 45; American Greetings website printout, Ex. 151 to Reback decl. |
| 327. PRG promotes its cards on Twitter and | 327. Reback decl., ¶ 46; |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
| --- | --- |
| Facebook. | American Greetings website printout, Ex. 152 to Reback decl. |
| 328. On PRG's website, there is an icon at the bottom of the page labeled Cardstore.com, which takes a consumer to www.cardstore.com. Cardstore is an American Greetings' card line, and consumers may purchase greeting cards on that website. | 328. Reback decl., ¶¶ 46-47; PRG and Cardstore website printouts, Exs. 152-53 to Reback decl. |
| 329. Defendants did not produce any art target for their Critter cards, Birthday cards, or Election cards. | 329. Reback decl., ¶ 61. |
| 330. In discovery, Defendants only produced seven variations of honey badger greeting cards, specifically: AGIN No. 4917247; AGIN No. 4935338; AGIN No. 4936683; AGIN No. 4945020; AGIN No. 5012925; AGIN No. 5049731; and AGIN No. 5223201. Meanwhile, Defendants' documents indicate there are 21 separate AGIN numbers. | 330. Reback decl., ¶ 70; Ex. 169 to Reback decl. |
| 331. Defendants sold their honey badger cards to Target, which sold the cards to the public. | 331. Reback decl., ¶ 71; Ex. 176 to Reback decl. |
| 332. Defendants have produced in this action copies of honey badger greeting cards designed by DCI with seven different AGIN numbers, i.e. the Honey Badger Critter Card, the Honey Badger Election Card, the Honey Badger Birthday Cards, the Freaky Wild Honey Badger Card and the | 332. Reback Decl. , ¶70, Exhs. 6,7, 8, 9. 10, 11 and 12. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| Halloween Honey Badger Cards. | |
| 333. An AGIN number is an identifier for a given greeting card. | 333. Campana Depo. 23:2-4. Reback Decl., Ex. 146. |
| 334. On December 22, 2014, DCI identified "Honey Badger" greeting cards with 21 different AGIN No.s that DCI in response to Gordon's claims. | 334. Campana Depo. 20:11-21, 23:8-24:7. Exh, 17. Reback Decl., Ex. 146. |
| 335. PRG reported sales of "Honey Badger" greeting cards identified by DCI with 14 different AGIN numbers. | 335. Campana Depo. 52:19-53:15, Exh. 18. Reback Decl., Ex. 146. |
| 336. Defendants have taken the position in discovery in this action that the only greeting cards that are relevant to Gordon's claims are the "Honey Badger" greeting cards designed by DCI. | 336. Oppenheimer Confidential Depo. 7:14-11:16; Reback Decl., Ex. 149. Drape Depo. 127:2-130:10. Reback Decl., Ex. 143. |
| 337. From 2009 to 2012, Noelle Shannon ("Shannon") was an artist manager for PRG. Shannon Depo. 11:10-22. | 337. From 2009 to 2012, Noelle Shannon ("Shannon") was an artist manager for PRG. Shannon Depo. 11:10-22. Reback Decl., Ex. 147. |
| 338. Shannon has worked in the greeting card business for over 17 years. | 338. Shannon Depo. 10:7-9. Reback Decl., Ex. 147. |
| 339. Shannon has stated that as artist manager for PRG, she was "responsible for communication to artists on content, message, design etc". and would analyze sales results and select designs for further growth into other programs". | 339. Shannon Depo. 63:18-65:5. Reback Decl., Ex. 147. |
| 340. Shannon testified at her deposition that | 340. Shannon Depo. 11:23- |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| it was not her responsibility to tell artists what to put in greeting cards. | 12:10. Reback Decl., Ex. 147. |
| 341. Shannon was the PRG art manager assigned to DCI . | 341. Drape Depo. 75:18-21; Reback Decl., Ex. 143. Shannon Depo. 18:1-6. Reback Decl., Ex. 147. |
| 342. The only humorous concept for a greeting card that Shannon remember Drape submitting to PRG in 2012 was one that "had a honey badger on it and it said some phrase "I don't care" and it was for a test. And that's all I remember." | 342. Shannon Depo. 20:24-21:7. Reback Decl., Ex. 147. |
| 343. Shannon has never seen the design for the Honey Badger Election Card that states: "Honey Badger and me just don't care". | 343. Shannon Depo. 22:2-12; Exh. 75. Reback Decl., Ex. 147. |
| 344. Shannon has not seen the Honey Badger Birthday Cards, the Honey Badger Halloween Cards, the Honey Badger Election Card or the Freaky Wild Honey Badger Card. | 344. Shannon Depo. 22:23-25:9; Exh.s 6, 7, 9, 10,11, and 12. Reback Decl., Ex. 147. |
| 345. Shannon remembers seeing the design for the Honey Badger Critter Card. | 345. Shannon Depo. 26:10-27:17; Exh. 76. Reback Decl., Ex. 147. |
| 346. Shannon did not discuss the copy or design of the Honey Badger Critter Card with Drape or anyone else. | 346. Shannon Depo. 29:15-30:1; Reback Decl., Ex. 147. Drape Depo. 87:12-88:2, Exhs. 8 and 76. Reback Decl., Ex. 143. |
| 347. Shannon does not recall there ever being a legal issue that arose regarding any of the Honey Badger related greeting cards until this action. | 347. Shannon Depo. 31:12-20. Reback Decl., Ex. 147. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| | |
| 348. Shannon never reviewed any of PRG'seasonal art targets, she only reviewed everyday art targets. | 348. Shannon Depo. 59:3-5. Reback Decl., Ex. 147. |
| 349. On or about January 2012, DCI received a PRG seasonal art target for Halloween 2013 ("Halloween Art Target"). | 349. Drape Depo. 75:9-17; Exh. 3. Reback Decl., Ex. 143. |
| 350. Drape does not know the purpose of art targets and never asked anyone. | 350. Drape Depo. 76:18-77:5, 77:21-78:8. Reback Decl., Ex. 143. |
| 351. The phrase "Honey Badger Don't Care" appears on Page 7 of the Halloween Art Target. | 351. Drape Depo. 75:9-17; Exh. 3 and 3(a). Reback Decl., Ex. 143. |
| 352. Drape does not recall seeing the image of a honey badger and the phrase "Honey Badger Don't Care" on page 7 of the Halloween Art Target in 2012. | 352. Drape Depo. 83:15-25; 85:3-15; Exh. 3 and 3(a). Reback Decl., Ex. 143. |
| 353. Drape does not recall if the image of a honey badger and the phrase "Honey Badger Don't Care" on page 7 of the Halloween Art Target was an inspiration for his idea for the design of the Honey Badger Halloween Card or Honey Badger Critter Card greeting cards that he testified he created. | 353. Drape Depo. 86:5-23; Exh. 3 and 3(a). Reback Decl., Ex. 143. |
| 354. Defendants have not produced any art targets for their Critter greeting cards, Birthday greeting cards, or Election greeting cards. | 354. Reback Decl. ¶ 61. |
| 355. Maria MacNamara ("MacNamara") started working at PRG as an art coordinator in December 2013. | 355. MacNamara Depo. 7:16-8:6, 8:24-9:11. Reback Decl., Ex. 145. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| | |
| 356. MacNamara never saw the Halloween Art Target before her deposition on September 12, 2015. | 356. MacNamaara Depo. 15:2-14. Reback Decl., Ex. 145. |
| 357. MacNamara had no involvement in the creation or selection of the Honey Badger Critter Card, the Honey Badger Election Card, the Honey Badger Birthday Card, the Honey Badger Birthday Cards, the Freaky Wild Honey Badger Card or the Honey Badger Halloween Cards. | 357. MacNamara Depo. 15:16-18:15; Exh.s 6,7,8,9,10, 11 and 12. Reback Decl., Ex. 145. |
| 358. MacNamara first started working as PRG's art manager for the DCI account in November 2014. | 358. MacNamara Depo. 18:16-21:5; Exh. 17. Reback Decl., Ex. 145. |
| 359. Alana Campana ("Campana") started working at PRG in August 2014 as creative director. | 359. Campana Depo. 10:19-24. Reback Decl., Ex. 146. |
| 360. Campana had no involvement in creating the "Honey Badger" greeting cards designed by DCI that have been produced by Defendants in this action. | 360. Campana Depo. 10:7-21. Reback Decl., Ex. 146. |
| 361. Aaron Siegel ("Siegel") started working for PRG in October 2015. | 361. Siegel Depo. 12:16-15:6. Reback Decl., Ex. 144. |
| 362. Siegel has never been involved in the development of designs for greeting cards. | 362. Siegel Depo. 21:20-25. Reback Decl., Ex. 144. |
| 363. Siegel never had any dealing with DCI prior to October 2015. | 363. Siegel Depo. 24:7-10. Reback Decl., Ex. 144. |
| 364. All of PRG's greeting cards are manufactured by American Greetings | 364. Siegel Depo. 46:3-7. Reback Decl., Ex. 144. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| Corporation. | |
| 365. In 2012, it was PRG's and American Greetings Corporation's customary business practice to do a intellectual proprty search if someone from "team" brought potential issues to the in-house legal department. | 365. Siegel Depo. 81:2-84:4. Reback Decl., Ex. 144. |
| 366. Defendants are not going to raise an advice of counsel defense in this action and asserted the attorney client privilege with respect to opinions regarding the use of the phrase "Honey Badger Don't Care from in-house counsel for PRG and American Greetings Corporation. | 366. Siegel Depo. 86:6-22. Reback Decl., Ex. 144. |
| 367. Exhibit No. 13 to Siegel's deposition purports to show the sales of the seven "Honey Badger" greeting cards that Defendants produced in this action. | 367. Siegel Depo. 1-7:4-15; Exhs. 6, 7. 8. 9, 10, 11 and 12. Reback Decl., Ex. 144. |
| 368. American Greetings Corporation paid for a trade advertisement for PRG that, among other things, depicts the Honey Badger Election Card. | 368. Siegel Depo. 160:8-161:12; Exhs. 34 and 35. Reback Decl., Ex.144. |
| 369. During the period beginning December 23, 2014 until at least July 1, 2016, PRG did not instruct its retailers to stop selling the "Honey Badger" greeting cards designed by DCI. | 369. Campana Depo. 39:14-43:13, 53:24-56:19, 59:20-60:11, 65:6-68:4; Rebeck Decl., Ex. 146. MacNamara Depo. 55:12-23, Exhs. 65, 66, 69, 71 and 72. Reback Decl., Ex.145. |
| 370. Siegel testified at his deposition on August 9, 2016 that it was the responsibility of PRG's art manager to | 370. Siegel Depo. 73:4-12. Reback Decl., Ex. 144. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| prepare art targets and that Shannon was the art manager as of the time the 2013 Halloween art target was prepared. | |
| 371. No one at PRG or American Greetings ever told Siegel why the phrase "Honey Badger Don't Care" was included in the 2013 Halloween Art Target. | 371. Siegel Depo. 78:24-79:24. Reback Decl., Ex. 144. |
| 372. Siegel testified at his deposition on August 9, 2016 that it was PRG's and American Greetings, Corporation's customary practice to do an intellectual property search if someone from the "team" brought a potential issue about a greeting card to in-house legal. | 372. Siegel Depo. 81:1-13. Reback Decl., Ex. 144. |
| 373. Siegel testified at his deposition on August 9, 2016 that a person named Jen Radziewicz of PRG advised him that at least one of the "Honey Badger" greeting cards at issue in this action was brought to in-house legal for PRG. | 373. Siegel Depo. 103:7-106:6. Reback Decl., Ex. 144. |
| 374. Siegel refused to disclose whether PRG or American Greetings Corporation had done a trademark search for the phrase "Honey Badger Don't Care" in 2012 based on the assertion of the attorney-client privilege. | 374. Siegel Depo. 81:25-84:27. Reback Decl., Ex. 144. |
| 375. On August 1, 2016, Defendants transmitted a letter to Plaintiff, requesting a Local Rule 7-3 meeting to discuss the substance of Defendants' intended motion for summary judgment, and identifying the issues to be raised in the motion. The letter does | 375. Letter dated August 1, 2016, Ex. 118 to Reback decl. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| not contain any reference to many arguments raised in Defendants' summary judgment motion, including their arguments based on the First Amendment, purported lack of adequate control over the trademark, or any argument based on lack of actual notice of a registered trademark. | |
| 376. On August 12, 2016, in accordance with Local Rule 7-3 and this Court's Standing Order, the parties' counsel participated in the requisite Conference of Counsel to discuss the issues to be raised by Defendants' anticipated motion for summary judgment. During the Rule 7-3 conference, Defendants never discussed their arguments based on the First Amendment, or purported lack of adequate control over a trademark, or any argument based on lack of actual notice of a registered trademark. Defendants also never mentioned they would bring a motion for partial summary judgment. | 376. Reback decl., ¶ 3. |
| 377. On August 19, 2016, Plaintiff first provided notice to Defendants of his intent to file certain documents that Defendants marked "confidential" pursuant to the Protective Order (Dkt. No. 49) as evidence in support of his opposition to Defendants' anticipated motion for summary judgment. On August 25, 2016, Defendants' counsel Sherylle Francis responded by email, identifying her objections to certain documents that Defendants contend are confidential and should be filed under | 377. Reback decl., ¶ 4. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| seal. | |
| 378. On August 30, 2016, the parties' counsel participated in a Conference of Counsel to discuss the appropriate procedure for sealing confidential documents in connection with Defendants' summary judgment motion, and Defendants' argument about a belated expert designation. Defendants did not discuss the substantive issues upon which their motion for summary judgment would be based. | 378. Reback decl., ¶ 7. |
| 379. On August 31, 2016, Defendants first emailed Plaintiff a draft Joint Statement of Counsel regarding L.R. 7-3 Meet and Confer. In response, Plaintiff noted several issues with the Joint Statement, including how: (1) it was untimely since the Conference of Counsel occurred on August 12, 2016; and (2) Defendants never discussed many issues raised in the Joint Statement during the Conference of Counsel on August 12, 2016. Plaintiff suggested the parties hold a Rule 7-3 conference at which Defendants discuss all the substantive issues Defendants intend to raise, and that afterwards a Joint Statement is timely filed within three days after the conference, in accord with the Court's Order. Defendants refused to do so. | 379. Reback decl., ¶ 9. |
| 380. On September 2, 2016, the parties filed a Joint Statement of Counsel regarding L.R. 7-3 Meet and Confer (Dkt. No. | 380. Reback decl., ¶ 10. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| 53). The Joint Statement does not contain any reference to many arguments raised in Defendants' summary judgment motion, including their arguments based on the First Amendment, purported lack of adequate control over the trademark, or any argument based on lack of actual notice of a registered trademark. | |
| 381. On August 10, 2016, Plaintiff noticed the depositions of DCI employees Tim McCabe and Scott Oppenheimer, and set the depositions for August 18 and 19, 2016, respectively, in Kansas City, where DCI is located. Defendants objected to the deposition dates. Plaintiff counsel replied he was willing to work with Defendants on alternative dates for the depositions "with the understanding that we want to take the depositions...before our client's opposition to the motion for summary judgment is due." | 381. Reback decl, ¶ 12. |
| 382. On August 24, 2016, Defendants' counsel told Plaintiff's counsel that Defendants will work to obtain the earliest dates for Mr. Oppenheimer's deposition. | 382. Reback decl., ¶ 13. |
| 383. After being advised that Mr. McCabe's deposition could proceed on September 19, 2016, on August 26, 2016, Plaintiff's counsel emailed Defendants' counsel, attaching an amended deposition notice for Mr. McCabe, and asking if Mr. Oppenheimer's deposition could proceed on either | 383. Reback decl., ¶ 13. |

| ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| September 19, 20 or 21. On August 31, 2016, Defendants' counsel advised that Mr. Oppenheimer was available for his deposition on September 20, 2016. | |
| 384. On September 19, 2016, the deposition of Tim McCabe proceeded in Kansas City. The next day, the deposition of Scott Oppenheimer proceeded in Kansas City. | 384. Reback decl., ¶ 14. |
| 385. On September 19, 2016, Defendants filed their motion for summary judgment, while Plaintiff's counsel Mr. Loeb was in Kansas City taking depositions of DCI employees, on dates provided by Defendants' counsel. | 385. Reback decl., ¶ 15. |
| 381. American Greetings Corporation entered into a licensing agreement for greeting cards with DCI on PRG's behalf. | 381. Reback decl., ¶72; American Greetings/DCI license agreement, Ex. 177 to Reback decl. |

DATED: September 26, 2016 KRANE & SMITH, APC

By: /s/ Ralph C. Loeb
Ralph C. Loeb

# CERTIFICATE OF SERVICE

CHRISTOPHER GORDON, an individual

vs.

DRAPE CREATIVE, INC., a Missouri corporation; PAPYRUS-RECYCLED GREETINGS, INC., an Illinois corporation; and DOES 1 to 10, inclusive

U.S. District Court, Central District of California
Case No. CV 15-04905 JFW

I hereby certify that a true and correct copy of the foregoing was served on all counsel registered to receive a Notice of Electronic Filing by electronically serving the document via the United States District Court Electronic Case filing website (CM/ECF notification system) for this case on this 26th day of September, 2016.

/s/ Daniel L. Reback
Daniel L. Reback